SUMMUM, a corporate sole and church, Plaintiff–Appellant,

v.

PLEASANT GROVE CITY, a municipal corporation; Jim Danklef, Mayor; Mark Atwood, City Council Member; Cindy Boyd, City Council Member; Mike Daniels, City Council Member; Darold McDade, City Council Member; Jeff Wilson, City Council Mem-

ber; Carol Harmer, former City Council Member; G. Keith Corry, former City Council Member; Frank Mills, City Administrator, Defendants–Appellees.

and

Summum, a corporate sole and church, Plaintiff–Appellant/Cross–Appellee,

v.

Duchesne City, a governmental entity; Clinton Park, Mayor of Duchesne City; Yordys Nelson; Nancy Wager; Paul Tanner; Darwin McKee; Jeannie Mecham, city council members, Defendants–Appellees/Cross–Appellants.

Nos. 06–4057, 05–4162, 05–4168, 05–4272 & 05–4282.

United States Court of Appeals, Tenth Circuit.

Aug. 24, 2007.

James L. Harris, Jr., Brian M. Barnard, Utah Legal Clinic, Salt Lake City, UT, for Plaintiff–Appellant.

Francis J. Manion, Geoffrey R. Surtees, American Center for Law & Justice, New Hope, KY, Edward L. White, III, Thomas More Law Center, Ann Arbor, MI, Meb W. Anderson, Stirba & Associates, Salt Lake City, UT, for Defendants–Appellees.

Before TACHA, Chief Judge, KELLY, HENRY, BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN, McCONNELL, TYMKOVICH, GORSUCH, and HOLMES, Circuit Judges.

## ORDER

These matters are before the court on two separate petitions for rehearing, both with en banc suggestions, filed by the appellees. The petitions were filed separately and correspond to the two opinions issued in these appeals on April 17, 2007.

The requests for panel rehearing are denied by the original panel which decided these cases.

The en banc petitions were transmitted to all of the judges of the court who are in regular active service. A poll was requested. Through an equally divided vote, the decisions of the panel will stand. *See* Fed. R.App. P. 35(a); 10th Cir. R. 35.5 (noting that a majority of the active judges of the court may order rehearing en banc). Accordingly, the en banc requests are denied. Judges Lucero, O'Brien, McConnell, Tymkovich, Gorsuch and Holmes would grant rehearing en banc. Judges Lucero and McConnell have filed dissents to the denial. They are attached and incorporated in this order. Judge Gorsuch has joined in Judge McConnell's dissent. Judge Tacha, writing separately, has responded. That response is also incorporated in this order.

LUCERO, J., dissenting from denial of rehearing en banc.

Because the panel's opinion will leave our circuit unnecessarily entangled in future review of time, place, and manner restrictions, and because in my judgment the panel's opinion incorrectly decides the question of the nature of the forum involved in cases of this type, I respectfully dissent from the denial of rehearing en banc. Conceptually, it is important to distinguish between transitory and permanent speech. As I see it, not unlike most public parks in America in which permanent monuments have been placed, the cases before us involve limited public fora. In limited public fora, local governments may make content-based determinations about what monuments to allow in such space, but may not discriminate as to viewpoint.

As an initial matter, I agree with the panel that these monuments do not constitute government speech. Under the *Wells* framework, the government must have exercised some control over the form and content of the speech before the fact, not merely accepted it after the fact. *Wells v. City & County of Denver*, 257 F.3d 1132, 1141–43 (10th Cir.2001) (holding sign was government speech where the city had "complete control over the sign's construction, message, and placement"; the city "built, paid for, and erected the sign"; and corporate sponsors did not "exercise[ ] any editorial control over its design or content."). In these cases, the private parties conceived the message and design of the monuments without any government input, thus the speech must be considered private. *See Summum v. City of Ogden*, 297 F.3d 995, 1004–06 (10th Cir.2002) (holding monument was not government speech where Fraternal Order of Eagles "designed, produced, and donated the Ten Commandments Monument"; central purpose of monument was "to promote the views and agenda of the Eagles rather than the City of Ogden"; "Eagles exercised complete control over the content of the Monument, turning over to the City of Ogden a completed product"; and city only claimed to adopt views of monument "post hoc"). It follows that these cases necessarily implicate government regulation of private speech.[1]

Whether government regulation of private speech violates the First Amendment depends on context. Courts engage in forum analysis to determine whether the speaker acts in a traditional public forum, a designated public forum, or a nonpublic forum, and it is in this analysis that I differ with the panel. In identifying the type of forum involved, we first consider the government property at issue and the type of access sought. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *City of Ogden*, 297 F.3d at 1001. Only after the type of forum is identified do we ask whether it is public or nonpublic in nature. Because the government property involved in these cases consists of the city parks, and the access sought is the installation of permanent monuments, the panel correctly concludes that the relevant forum consists of permanent monuments in the city parks. *See Summum v. Pleasant Grove City*, 483 F.3d 1044, 1050 (10th Cir.2007); *Summum v. Duchesne City*, 482 F.3d 1263, 1269 n. 1 (10th Cir.2007). In the next step of the forum analysis, however, the panel asserts that the relevant forum is the *entire* park, regardless of the type of access sought. *Pleasant Grove*, 483 F.3d at 1050; *Duchesne*, 482 F.3d at 1269. The panel's claim that access "is relevant in defining the forum, but ... does not determine the *nature* of that forum," *id.* at 1269 n. 1, confuses the forum analysis. Only by defining the forum with reference to the access sought can a court determine the nature of that forum. *See Cornelius*, 473 U.S. at 801, 105 S.Ct. 3439. In *Perry Education Ass'n v. Perry Local Educators' Ass'n*, a case which the panel cites, the Supreme Court first narrowed the forum to the mail delivery system within a school, and only then did it consider the nature of this forum; it did not simply conclude that schools in general are public fora. 460 U.S. 37, 49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *Perry* also held that a court may make conceptual distinctions in defining the forum, even if there are no physical barriers. *See Cornelius*, 473 U.S. at 801, 105 S.Ct. 3439 ("*Perry* ... examined the access sought by the speaker and

---

1. Although the monument involves a religious message, these cases properly consider the question of free speech, not establishment of religion.

defined the forum as a school's internal mail system and the teachers' mailboxes, notwithstanding that an 'internal mail system' lacks a physical situs.") (citation omitted). As in *Perry* and *Cornelius*, Summum seeks access to a particular means of communication, but the nature of the forum necessarily hinges both on the method of communication and on the location.

The panel gives great weight to the conception that city parks are "quintessential public forums," *see Perry*, 460 U.S. at 45, 103 S.Ct. 948, but in my view, permanent displays do not fall within the set of uses for which parks have traditionally been held open to the public. In *Perry*, the Court noted that parks are "places which by *long tradition* or by government fiat have been devoted to *assembly and debate*," and "which have *immemorially* been held in trust for the use of the public, and, *time out of mind*, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* (quotation omitted) (emphasis added). As *Perry* indicates, our modern concept of the park as a public forum derives from a well-established common law right to assemble and speak one's mind in the commons. This right, however, does not extend to the type of displays at issue here, and one would be hard pressed to find a "long tradition" of allowing people to permanently occupy public space with any manner of monuments. In short, a park is a traditional public forum when access is sought to it for temporary speech and assembly, such as protests or concerts, but it hardly follows that parks have been held open since time immemorial for the installation of statues of Balto the Husky or the sword-wielding King Jagiello, to note two of the more popular attractions in New York City's Central Park.

I recognize that there is some disagreement among our sister circuits on this point, but courts consistently have given special consideration to the issue of displays installed on public land. In *Graff v. City of Chicago*, 9 F.3d 1309, 1314 (7th Cir.1993), the Seventh Circuit held that "[t]here is no private constitutional right to erect a structure on public property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures." (quotation and citation omitted). The Second Circuit in *Kaplan v. City of Burlington*, 891 F.2d 1024, 1029 (2d Cir.1989), determined that the city "had not created a forum in City Hall Park open to the unattended, solitary display of religious symbols." By stating that the City of Burlington must affirmatively open the public park for this kind of use, the Second Circuit recognized that such physical occupation of park space does not fall within the scope of the traditional public forum, but rather the government must assent to such access before a forum is created. By contrast, the Ninth Circuit has held that "[n]o affirmative government action is required to open a traditional public forum to a specific type of expressive activity." *Kreisner v. City of San Diego*, 1 F.3d 775, 785 (9th Cir.1993). *Kreisner* acknowledged, however, that the government might close the park with respect to large unattended displays, but held that the plaintiff had failed to meet his burden of proof on this point. *Id.* This is to say, that even the *Kreisner* court has recognized that it is not a foregone conclusion that parks are traditional public fora for all uses, particularly for the installation of permanent displays.

In my view a park is not a traditional public forum insofar as the placement of monuments is concerned, but that still leaves the question of whether it is a designated public forum or a nonpublic forum. Although there is a disagreement among our sister circuits regarding the categori-

zation of limited public fora, this circuit and recent Supreme Court opinions have treated limited public fora as a species of nonpublic fora. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–107, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (in a limited public forum, the state may restrict speech but many not discriminate on the basis of viewpoint (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439)); *City of Ogden*, 297 F.3d at 1002 n. 4 ("A 'limited public forum' is a subset of the nonpublic forum classification."); *Callaghan*, 130 F.3d at 914 ("In more recent cases . . . the Court has used the term 'limited public forum' to describe a type of nonpublic forum"); *see also Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Schs.*, 457 F.3d 376, 382 n. 3 (4th Cir.2006) (surveying conflicting views among the circuits). In the present cases, the city governments have not allowed the kind of "general access" or "indiscriminate use" of park property that is a hallmark of a designated public forum. *Summum v. Callaghan*, 130 F.3d 906, 915 n. 13 (10th Cir.1997) (*citing Cornelius*, 473 U.S. at 803, 105 S.Ct. 3439; *Perry*, 460 U.S. at 47, 103 S.Ct. 948). Instead, they have "create[d] a channel for a specific or limited type of expression where one did not previously exist," *Child Evangelism Fellowship*, 457 F.3d at 382, and have thus established limited public fora. As discussed *supra*, the right to install permanent monuments did not previously exist in these parks, and in these cases the cities have allowed only "selective access to some speakers or some types of speech in a nonpublic forum." *Callaghan*, 130 F.3d at 916. Here, the cities have permitted a few monuments to be erected for specific purposes—in the case

of Pleasant Grove, to memorialize the city's history, and in the case of Duchesne, to honor service groups. Having created limited public fora, the cities may make reasonable content-based, but viewpoint-neutral, decisions as to who may install monuments in the parks.[2] *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439.

There are some indications that the cities engaged in impermissible viewpoint discrimination by denying Summum access to the limited public fora, and the need for further briefing and argument on this point is one reason why en banc proceedings are necessary. More importantly, however, the panel has given an unnatural reading to the traditional public forum doctrine, and binds the hands of local governments as they shape the permanent character of their public spaces. Although these governments may enact time, place, and manner restrictions that will give them some control over monuments in their parks, they now must proceed on the basis of the panel's faulty legal reasoning. More troubling is that such restrictions will undoubtedly be challenged in court and reviewed under a strict scrutiny standard. The panel decision forces cities to choose between banning monuments entirely, or engaging in costly litigation where the constitutional deck is stacked against them. Because I believe the panel's legal conclusions are incorrect, and that its decisions will impose unreasonable burdens on local governments in this circuit, I would grant rehearing en banc.

McCONNELL, J., joined by GORSUCH, J., dissenting from denial of rehearing en banc.

These opinions hold that managers of city parks may not make reasonable, content-based judgments regarding whether

---

**2.** By contrast, when the government itself speaks, it may discriminate as to both content and viewpoint. *Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510.

to allow the erection of privately-donated monuments in their parks. If they allow one private party to donate a monument or other permanent structure, judging it appropriate to the park, they must allow everyone else to do the same, with no discretion as to content-unless their reasons for refusal rise to the level of "compelling" interests. *See Summum v. Duchesne City,* 482 F.3d 1263, 1274 (10th Cir.2007) (a "constitutional right exists to erect a permanent structure on public property ... when the government allows some groups to erect permanent displays, but denies other groups the same privilege"); *Summum v. Pleasant Grove City,* 483 F.3d 1044, 1054 (10th Cir.2007) (the city "could ban all permanent displays of an expressive nature by private individuals" but may not exclude a monument based on its content unless the restriction serves "compelling" interests and is "narrowly tailored to achieve its stated interests"). This means that Central Park in New York, which contains the privately donated Alice in Wonderland statute, must now allow other persons to erect Summum's "Seven Aphorisms," or whatever else they choose (short of offending a policy that narrowly serves a "compelling" governmental interest). Every park in the country that has accepted a VFW memorial is now a public forum for the erection of permanent fixed monuments; they must either remove the war memorials or brace themselves for an influx of clutter.

Significantly, the religious nature of the donated monuments is not relevant to the free speech question (though it would be to an Establishment Clause challenge). These cases happen to involve Ten Commandments monuments, but it could work the other way. A city that accepted the donation of a statue honoring a local hero could be forced, under the panel's rulings, to allow a local religious society to erect a Ten Commandments monument—or for that matter, a cross, a nativity scene, a statue of Zeus, or a Confederate flag.

With all due respect to the panel, this conclusion is unsupported by Supreme Court precedent. None of the cases cited supports this proposition. By tradition and precedent, city parks—as "traditional public forums"—must be open to speeches, demonstrations, and other forms of transitory expression. But neither the logic nor the language of these Supreme Court decisions suggests that city parks must be open to the erection of fixed and permanent monuments expressing the sentiments of private parties. By their policies or actions, governments may create designated public forums with respect to fixed monuments, but—contrary to these opinions—the mere status of the property as a park does not make it so.

It is plain that the cities in these cases did not create designated public forums for the erection of permanent monuments in their parks. In the *Duchesne* case, the Ten Commandments monument is apparently the only fixed monument in the park. In *Pleasant Grove,* the other permanent structures and monuments "relate to or commemorate Pleasant Grove's pioneer history." 483 F.3d at 1047. In neither case did the city, by word or deed, invite private citizens to erect monuments of their own choosing in these parks. It follows that any messages conveyed by the monuments they have chosen to display are "government speech," and there is no "public forum" for uninhibited private expression.

In *Van Orden v. Perry,* 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005), the Supreme Court considered a nearly identical monument donated by the Fraternal Order of Eagles to the State of Texas and displayed under analogous circumstances. Without dissent on this point, the Court unhesitatingly concluded the monument

was a *state* display, and applied Establishment Clause doctrines applicable to government speech. *Id.* at 692, 125 S.Ct. 2854 (calling the monument "Texas' display"). Various courts of appeals have reached the same conclusion on similar facts. *ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 772, 778, 774 (8th Cir. 2005) (Eagles monument "installed ... by the City" and counted as "City's display"); *Van Orden v. Perry*, 351 F.3d 173, 176 (5th Cir.2003) (Eagles monument belonged to the state); *Adland v. Russ*, 307 F.3d 471, 489 (6th Cir.2002) (donated Eagles monument constituted state speech in violation of the Establishment Clause); *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir.2001) (city's acceptance of donated Ten Commandments monument constituted state action in violation of the Establishment Clause); *Books v. City of Elkhart*, 235 F.3d 292, 301 (7th Cir.2000) (city's display of Ten Commandments monument was state action violating Establishment Clause). *See also Modrovich v. Allegheny County*, 385 F.3d 397, 399–400 (3d Cir.2004) (bronze plaque of Ten Commandments donated by private party and affixed to courthouse wall constituted government speech).

Our own leading precedent on government speech confirms these holdings.[1] *Wells v. City and County of Denver*, 257 F.3d 1132 (10th Cir.2001), involved a temporary holiday display, which was on municipal property and co-sponsored by the city and private businesses; the display included a large sign on city property thanking private donors for their contributions to the city's holiday display. The Court concluded that the message conveyed by this sign was government speech. The city, we reasoned, chose to erect the sign for its own purposes, the city controlled the content of the sign, and it determined when, where, and how the sign would be displayed. 257 F.3d at 1141–42. *Wells* employed a four-part analysis derived from the Eighth Circuit's *Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.*, 203 F.3d 1085 (8th Cir.2000), which involved the asserted right of the Missouri KKK to sponsor a segment of All Things Considered on National Public Radio.[2] In both *Wells* and *Knights*, the governmental or private character of the speech was in doubt because "ownership" could not be clearly established. Did the holiday decor belong to the city or to the private donors in *Wells?* Did the sponsorship message written by the KKK belong to that organization or to the public employee who broadcast it statewide on a state radio station?

The instant cases are easier than *Wells*, because ownership of the "speech" in these cases is clear: the Ten Commandments monument in *Duchesne* was donated by the Cole family to the City of Duchesne, and the Ten Commandments monument in *Pleasant Grove* was donated by the Fraternal Order of Eagles to the City of Pleasant Grove. At the relevant time, the cities owned the monuments, maintained them, and had full control over them. But even if ownership were not clear, the second and fourth prongs of the *Wells* test

---

**1.** To the extent *Summum v. Callaghan*, 130 F.3d 906 (10th Cir.1997), and *Summum v. City of Ogden*, 297 F.3d 995 (10th Cir.2002), teach the contrary, they should be overruled.

**2.** The factors were:

(1) that "the central purpose of the enhanced underwriting program is not to promote the views of the donors;" (2) that the station exercised editorial control over the content of acknowledgment scripts; (3) that the literal speaker was a KWMU employee, not a Klan representative; and (4) that ultimate responsibility for the contents of the broadcast rested with KWMU, not with the Klan.

*Wells*, 257 F.3d at 1141 (quoting *Knights of the Ku Klux Klan*, 203 F.3d at 1093–94).

would nonetheless be dispositive: The cities exercised total "control" over the monuments, 257 F.3d at 1141, and they bore "ultimate responsibility" for the monuments' contents and upkeep. Indeed, because the cities owned the monuments, they could have removed them, destroyed them, modified them, remade them, or (following state law procedures for disposition of public property) sold them at any time. Indeed, the City of Duchesne attempted to do just that—sell the monument along with the plot of land on which it sits. See 482 F.3d at 1266–67.[3] *Cf. Serra v. U.S. General Servs. Admin.*, 847 F.2d 1045, 1049 (2d Cir.1988) (holding that when an artist donates or sells a piece of art to the government for public display, the artist loses control over the artwork).

The only difference from *Wells* is that in the *Summum* cases, the cities did not design these monuments. The cities, however, accepted the statues, treated them as public property, and displayed them for their own purposes on public land. The cities were under no obligation to accept the statues, and could have objected to their content. When they accepted donation of the monuments and displayed them on public land, the cities embraced the messages as their own. Similarly, Duchesne and Pleasant Grove controlled the placement of the statues, just as in *Wells* Denver bore "ultimate responsibility for the content of the display." 257 F.3d at 1142.

Once we recognize that the monuments constitute government speech, it becomes clear that the panel's forum analysis is misguided. Viewpoint- and sometimes content-neutrality are required when the government regulates speech in public forums, but the government's "own speech ... is controlled by different principles."

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 834, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Specifically, "when the State is the speaker, it may make content-based choices." *Id.* at 833, 115 S.Ct. 2510. *See also Rust v. Sullivan*, 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The government may adopt whatever message it chooses—subject, of course, to other constitutional constraints, such as those embodied in the Establishment Clause—and need not alter its speech to accommodate the views of private parties. *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir.2000) ("Simply because the government opens its mouth to speak does not give every outside ... group a First Amendment right to play ventriloquist.") In other words, just because the cities have opted to accept privately financed permanent monuments does not mean they must allow other private groups to install monuments of their own choosing.

Other circuits have reached this conclusion in similar cases. *See Tucker v. City of Fairfield*, 398 F.3d 457, 462 (6th Cir. 2005) ("Courts have generally refused to protect on First Amendment grounds the placement of objects on public property where the objects are permanent or otherwise not easily moved."); *Graff v. City of Chicago*, 9 F.3d 1309, 1314 (7th Cir.1993) (en banc) ("even in a public forum there is no constitutional right to erect a structure"); *Lubavitch Chabad House, Inc. v. Chicago*, 917 F.2d 341, 347 (7th Cir.1990) ("We are not cognizant of ... any private constitutional right to erect a structure on private property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures.").

---

3. Indeed, the panel held that Duchesne's attempted sale of the monument is controlled by state law governing the disposition of

"public property." *Duchesne*, 482 F.3d at 1272.

This does not mean that the Ten Commandments monuments in Duchesne and Pleasant Grove are immune to First Amendment challenge. Rather, as government speech, they may be challenged by appropriate plaintiffs under the Establishment Clause, as applied to the States through the Fourteenth Amendment. Their validity would depend on details of their context and history, in accordance with the Supreme Court's recent decisions in *McCreary County v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005), and *Van Orden v. Perry*, 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005). We have no occasion here to speculate on the outcome of any such litigation.

The panels' decisions in these cases, however, are incorrect as a matter of doctrine and troublesome as a matter of practice. I realize that en banc proceedings are a major investment of time and judicial resources, and that we cannot en banc every case that errs. But the error in this case is sufficiently fundamental and the consequences sufficiently disruptive that the panel decisions should be corrected.

TACHA, J., response to dissent from denial of rehearing en banc.

Throughout my judicial career, I have been loath to write separately because I firmly believe that an intermediate court of appeals should speak with as much clarity and consensus as possible. I reluctantly take the unprecedented step of responding to the dissents from the denial of rehearing en banc because, left unanswered, the dissents could lead a reader to conclude that these cases present unresolved issues that are properly raised and appropriately addressed on these facts. In particular, I write to emphasize that these cases do not raise novel or unsettled questions regarding government speech. Nor do the panel decisions suggest that, when cities display permanent private speech on public property, they necessarily open the floodgates to any and all private speech in a comparable medium. Rather, the decisions follow well-established First Amendment precedent requiring that cities regulate private speech in public forums equally.

Because the opinions contain clear discussions of the legal authority on which they rely, I need not respond at length to the allegation that they are unsupported by Supreme Court precedent. I need only say that the Supreme Court has never distinguished between transitory and permanent expression for purposes of forum analysis. In fact, this distinction, so crucial to the reasoning of both dissents, lacks the support of both precedent and logic. If a city allows a private message to be heard in a public park, why would the permanent nature of the expression limit the First Amendment scrutiny we apply?

As Supreme Court precedent makes clear, the type of speech does not, and should not, determine the nature of the forum. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (holding that city's restriction on *permanent* commercial newsracks on *public sidewalks* (a public forum) was an impermissible content-based restriction on speech). If a city wishes to regulate the number of permanent private displays in a public forum, it may do so through reasonable content-neutral regulations governing the time, manner, or place of such speech. *See id.* at 429–30, 113 S.Ct. 1505 ("It is the absence of a neutral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content neutral."); *see also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (noting that a reasonable content-neutral ban on all unattended private displays in public forum would likely be constitutional, but a regulation based on

content must be "necessary, and narrowly drawn, to serve a compelling state interest").[1]

Judge McConnell's dissent would have us ignore these well-established forum principles when the government does not "by word or deed" create a designated public forum for permanent private expression. Dissent at 1175. In this view, if the government has not created a designated public forum, its acceptance alone turns private speech into government speech. More important, under this approach, government acceptance of the physical *medium* of speech, not the message, is sufficient. This approach is an unprecedented, and dangerous, extension of the government speech doctrine. To make government ownership of the physical vehicle for the speech a threshold question would turn essentially all government-

funded speech into government speech. But this would be an absurd result. No one thinks *The Great Gatsby* is government speech just because a public school provides its students with the text. This is because the speech conveyed by the physical text remains private speech regardless of government ownership.

Although a public school is engaging in speech activity when it selects the text, its ability to do so is based on a different line of Supreme Court cases recognizing the government's ability to make content-based judgments when it acts in particular roles (e.g., educator, librarian, broadcaster, and patron of the arts). We note this distinction in both opinions. *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1052 n. 4 (10th Cir.2007); *Summum v. Duchesne City*, 482 F.3d 1263, 1269 n. 2 (10th Cir.2007).[2] In light of this precedent, the

---

1. Contrary to Judge Lucero's dissent, the description of the forum as "permanent monuments in a city park" does not change the nature of the forum from a traditional public forum to some kind of limited or nonpublic forum. To focus solely on the monuments (i.e., the form of speech) and ignore the underlying property would be a distortion of Supreme Court precedent, as explained above. Furthermore, the conclusion that permanent speech is more limited than transitory speech defies logic. Like temporary signs and demonstrations, permanent displays most certainly encompass the government property; indeed, permanent monuments are physically attached to and always present on the property. Unlike the speaker in *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), who sought access to teachers' mailboxes, Summum did not seek access to "a forum within the confines of the government property," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); rather, it sought permanent access to the physical property itself. Thus, although the relevant forum in these cases is "permanent monuments in a city park," the access sought is not the kind of limited access that allows for a more narrow definition of the forum. This is

true even if we accept the view that a speaker does not have a constitutional right to erect a permanent display in a public forum. Because the cities had already permitted the permanent display of a private message, the only question properly before the panel was whether the cities could exclude other permanent private speech on the basis of content, that is, whether they could constitutionally *discriminate* among private speakers in a public forum.

2. We cite the following Supreme Court cases in both opinions: *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 205, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (plurality opinion) (recognizing that public library staffs may consider content in making collection decisions); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (recognizing that broadcasters must "exercise substantial editorial discretion in the selection and presentation of their programming"); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (holding that the NEA may consider content in awarding grants as such judgments "are a consequence of the nature of arts funding"). *See Pleasant Grove City*, 483 F.3d at 1052 n. 4; *Duchesne City*, 482 F.3d at 1269 n. 2.

City of New York, acting as a patron of the arts, need not worry about having to erect all manner of structures based on the installation of Alice in Wonderland and other works of art in Central Park. We cannot, however, extend the reasoning of these Supreme Court decisions to allow the government to make content-based decisions concerning *all* permanent private speech in a public forum. As the panel decisions explain, the cities in these two cases were acting as regulators of private speech and not, for example, as patrons of the arts.

In short, the government does not speak just because it owns the physical object that conveys the speech. Instead, as the Supreme Court has explained, the appropriate inquiry is whether the government controls the content of the speech at issue, that is, whether the message is a government-crafted message. *See, e.g., Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 560, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005) (holding that beef advertising campaign constituted government speech because the "message set out in the beef promotions is from beginning to end the message established by the Federal Government"). The four-factor approach to government speech that we adopted in *Wells v. City and County of Denver*, 257 F.3d 1132, 1140–42 (10th Cir.2001), reflects the Supreme Court's focus on whether the message is the government's own. But contrary to Judge McConnell's dissent, we said nothing in *Wells* that suggests our government speech inquiry turns on the ownership of the physical medium conveying the speech at issue.[3] Indeed, the second *Wells* factor cited by the dissent is not about controlling the physical medium of the speech, but about controlling the *content* of that speech. *See id.* at 1142 (find-

ing that the city exercised editorial control over the content of the speech). A city's control over a physical monument does not therefore transform the message inscribed on the monument into city speech. If this were true, the government could accept any private message as its own without subjecting the message to the political process, a result that would shield the government from First Amendment scrutiny and democratic accountability.

This is in fact the result that Judge McConnell's dissent advocates, and it is most apparent in the dissent's equation of government endorsement in the Establishment Clause context with government speech under the Free Speech Clause. Citing *Van Orden v. Perry*, 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005), the dissent emphasizes that the Supreme Court has characterized a Ten Commandments monument under analogous circumstances as a "state display" for purposes of the Establishment Clause. *See id.* at 692, 125 S.Ct. 2854 (holding that "Texas' display of this monument" did not violate the Establishment Clause). The simplest response to this observation is that a state's display of a monument is not necessarily state speech; if the government *displays* a private religious message, its display may be challenged under the Establishment Clause regardless of whether the government adopted the monument's message as its own. *See Pleasant Grove City*, 483 F.3d at 1047 n. 2 (explaining that the government may violate the Establishment Clause without directly speaking). *Van Orden* and the circuit cases cited by the dissent stand for the simple proposition that a city's acceptance and display of a privately donated monument with religious content may constitute state *action* violat-

---

**3.** Moreover, contrary to Judge McConnell's dissent, *see* Dissent at 1176, the city's ownership of the holiday display in *Wells* was clearly established. *Wells*, 257 F.3d at 1139 (noting that, as a factual matter, "Denver owns each component part of the display").

ing the Establishment Clause. But none of these cases supports the proposition that, when the state acts to accept a monument, it automatically turns the message that monument conveys into state speech.[4]

On a broader note, because the Establishment and Free Speech Clauses serve different purposes, discussions of state action in Establishment Clause cases are not germane to a determination of when the government speaks for purposes of the Free Speech Clause. Indeed, the Supreme Court has analyzed government speech differently in the context of free speech, recognizing the differing theoretical justifications underlying the Establishment and Free Speech Clauses. In the Establishment Clause context, government speech favoring or disfavoring religion is a concern because of the effect it may have on individual members of the political community: "The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." *Lynch v. Donnelly*, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Indeed, in deciding that a student-led "invocation" permitted by school policy could "not properly [be] characterized as 'private speech'" under the Establishment Clause, the Supreme Court focused explicitly on the message that government *sponsorship* sends members of the community: "School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–10, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (quotation omitted). In other words, the government's sponsorship of religion sends an impermissible "ancillary message" that renders the speech not entirely private.

The same concerns do not underpin the Free Speech Clause. Although individuals may constitutionally challenge government sponsorship or endorsement of religion, they generally have no constitutional right to challenge government speech under the Free Speech Clause. In the free speech context, the fact that government speech is exempt from constitutional challenge is justified because it is subject to the political process:

> The latitude which may exist for restrictions on speech where the government's own message is being delivered flows in part from our observation that, "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy."

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000)). That is, the latitude that government speech enjoys in the free speech context is justified by the *"political safeguards"* in the democratic process that set government speech "apart from private messages." *Johanns*, 544 U.S. at 563, 125 S.Ct. 2055 (emphasis added). Thus, its immunity from constitutional

---

4. In fact, one case cited in Judge McConnell's dissent contains language specifically rejecting this proposition. *Modrovich v. Allegheny County*, 385 F.3d 397, 410–11 (3d Cir.2004) ("The fact that government buildings continue to preserve artifacts of [the country's religious] history does not mean that they necessarily support or endorse the particular messages contained in those artifacts.").

challenge under the Free Speech Clause does not depend on whether the "reasonable observer," familiar to Establishment Clause jurisprudence, would perceive the government as speaking.

Rather, if citizens object to the government's message, they may elect new representatives who "later could espouse some different or contrary position." *Southworth,* 529 U.S. at 235, 120 S.Ct. 1346. But in order for citizens to be able to hold the government accountable for its speech, the government must speak subject to "traditional political controls [that] ensure responsible government action." *Id.* at 229, 120 S.Ct. 1346; *see also Johanns,* 544 U.S. at 560–64, 125 S.Ct. 2055 (concluding that promotional program was subject to adequate safeguards because its message was prescribed by federal law and the government supervised and controlled the program and the contents of its message). The speech in these cases was not subject to political safeguards; the facts simply do not implicate government speech because the cities exercised no control over the content of the messages.

Thus, in the context of the Free Speech Clause, we cannot extend the government speech doctrine any further. To extend government speech to the context before us would allow the government to discriminate among private speakers in a public forum by claiming a preferred message as its own. Moreover, because the Establishment Clause would apply only to religious expression, an expanded government speech doctrine would effectively remove the government's regulation of permanent non-religious speech from all First Amendment scrutiny. Such an approach is clearly contrary to established First Amendment principles. *See Planned Parenthood of S.C., Inc. v. Rose,* 361 F.3d 786, 795–96 (4th Cir.2004) ("The government speech doctrine was not intended to authorize cloaked advocacy that allows the State to promote an idea without being accountable to the political process."). Because this approach to government speech is unsupported by Supreme Court precedent and the purposes of the First Amendment, this Court may not consider it. And because the relevant law and its application are clear, en banc consideration is inappropriate.