*464 Justice Alito
delivered the opinion of the Court.
This case presents the question whether the Free Speech Clause of the First Amendment entitles a private group to insist that a municipality permit it to place a permanent monument in a city park in which other donated monuments were previously erected. The Court of Appeals held that the municipality was required to accept the monument because a public park is a traditional public forum. We conclude, however, that although a park is a traditional public forum for speeches and other transitory expressive acts, the display of a permanent monument in a public park is not a form of expression to which forum analysis applies. Instead, the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause.
I
A
Pioneer Park (or Park) is a 2.5-acre public park located in the Historic District of Pleasant Grove City (or City) in Utah. The Park currently contains 15 permanent displays, at least 11 of which were donated by private groups or indi *465 viduals. These include a historic granary, a wishing well, the City’s first fire station, a September 11 monument, and a Ten Commandments monument donated by the Fraternal Order of Eagles in 1971.
Respondent Summum is a religious organization founded in 1975 and headquartered in Salt Lake City, Utah. On two separate occasions in 2003, Summum’s president wrote a letter to the City’s mayor requesting permission to erect a “stone monument,” which would contain “the Seven Aphorisms of SUMMUM”[1] and be similar in size and nature to the Ten Commandments monument. App. 57, 59. The City denied the requests and explained that its practice was to limit monuments in the Park to those that “either (1) directly relate to the history of Pleasant Grove, or (2) were donated by groups with long-standing ties to the Pleasant Grove community.” Id., at 61. The following year, the City passed a resolution putting this policy into writing. The resolution also mentioned other criteria, such as safety and esthetics.
*466 In May 2005, respondent’s president again wrote to the mayor asking to erect a monument, but the letter did not describe the monument, its historical significance, or Sum-mum’s connection to the community. The city council rejected this request.
B
In 2005, respondent filed this action against the City and various local officials (petitioners), asserting, among other claims, that petitioners had violated the Free Speech Clause of the First Amendment by accepting the Ten Commandments monument but rejecting the proposed Seven Aphorisms monument. Respondent sought a preliminary injunction directing the City to permit Summum to erect its monument in Pioneer Park. After the District Court denied Summum’s preliminary injunction request, No. 2:05CV00638, 2006 WL 3421838 (D Utah, Nov. 22, 2006), respondent appealed, pressing solely its free speech claim.
A panel of the Tenth Circuit reversed. 483 F. 3d 1044 (2007). The panel noted that it had previously found the Ten Commandments monument to be private rather than government speech. See Summum v. Ogden, 297 F. 3d 995 (2002). Noting that public parks have traditionally been regarded as public forums, the panel held that the City could not reject the Seven Aphorisms monument unless it had a compelling justification that could not be served by more narrowly tailored means. See 483 F. 3d, at 1054. The panel then concluded that the exclusion of respondent’s monument wás unlikely to survive this strict scrutiny, and the panel therefore held that the City was required to erect Summum’s monument immediately.
The Tenth Circuit denied the City’s petition for rehearing en banc by an equally divided vote. 499 F. 3d 1170 (2007). Judge Lucero dissented, arguing that the Park was not a traditional public forum for the purpose of displaying monuments. Id., at 1171. Judge McConnell also dissented, con *467 tending that the monuments in the Park constitute government speech. Id., at 1174.
We granted certiorari, 552 U. S. 1294 (2008), and now reverse.
II
No prior decision of this Court has addressed the application of the Free Speech Clause to a government entity’s acceptance of privately donated, permanent monuments for installation in a public park, and the parties disagree sharply about the line of precedents that governs this situation. Petitioners contend that the pertinent cases are those concerning government speech. Respondent, on the other hand, agrees with the Court of Appeals panel that the applicable cases are those that analyze private spéech in a public forum. The parties’ fundamental disagreement thus centers on the nature of petitioners’ conduct when they permitted privately donated monuments to be erected in Pioneer Park. Were petitioners engaging in their own expressive conduct? Or were they providing a forum for private speech?
A
If petitioners were engaging in their own expressive conduct, then the Free Speech Clause has no application. The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech. See Johanns v. Livestock Marketing Assn., 544 U. S. 550, 553 (2005) (“[T]he Government’s own speech ... is exempt from First Amendment scrutiny”); Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U. S. 94, 139, n. 7 (1973) (Stewart, J., concurring) (“Government is not restrained by the First Amendment from controlling its own expression”). A government entity has the right to “speak for itself.” Board of Regents of Univ. of Wis. System v. Southworth, 529 U. S. 217, 229 (2000). “[I]t is entitled to say what it wishes,” Rosenberger v. Rector and Visitors of Univ. *468 of Va., 515 U. S. 819, 833 (1995), and to select the views that it wants to express, see Rust v. Sullivan, 500 U. S. 173, 194 (1991); National Endowment for Arts v. Finley, 524 U. S. 569, 598 (1998) (Scalia, J., concurring in judgment) (“It is the very business of government to favor and disfavor points of view”).
Indeed, it is not easy to imagine how government could function if it lacked this freedom. “If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.” Keller v. State Bar of Cal., 496 U. S. 1, 12-13 (1990). See also Johanns, 544 U. S., at 574 (Souter, J., dissenting) (“To govern, government has to say something, and a First Amendment heckler’s veto of any forced contribution to raising the government’s voice in the ‘marketplace of ideas’ would be out of the question” (footnote omitted)).
A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message. See id., at 562 (opinion of the Court) (where the government controls the message, “it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources”); Rosenberger, supra, at 833 (a government entity may “regulate the content of what is or is not expressed ... when it enlists private entities to convey its own message”).
This does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause. The involvement of public officials in advocacy may be limited by law, regulation, or practice. And of course, a government entity is ultimately “accountable to the electorate and the political process for its advocacy.” Southworth, 529 U. S., at 235. “If the *469 citizenry objects, newly elected officials later could espouse some different or contrary position.” Ibid.
B
While government speech is not restricted by the Free Speech Clause, the government does not have a free hand to regulate private speech on government property. This Court long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks, “which ‘have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.’” Perry Ed. Assn. v. Perry Local Educators’ Assn., 460 U. S. 37, 45 (1983) (quoting Hague v. Committee for Industrial Organization, 307 U. S. 496, 515 (1939) (opinion of Roberts, J.)). In order to preserve this freedom, government entities are strictly limited in their ability to regulate private speech in such “traditional public fora.” Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U. S. 788, 800 (1985). Reasonable time, place, and manner restrictions are allowed, see Perry Ed. Assn., supra, at 45, but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, see Cornelius, supra, at 800, and restrictions based on viewpoint are prohibited, see Carey v. Brown, 447 U. S. 455, 463 (1980).
With the concept of the traditional public forum as a starting point, this Court has recognized that members of the public have free speech rights on other types of government property and in certain other government programs that share essential attributes of a traditional public forum. We have held that a government entity may create “a designated public forum” if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose. See Cornelius, 473 U. S., at 802. Gov- *470 eminent restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum. Id., at 800.
The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. Perry Ed. Assn., supra, at 46, n. 7. In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral. See Good News Club v. Milford Central School, 533 U. S. 98, 106-107 (2001).
Ill
There may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech, but this case does not present such a situation. Permanent monuments displayed on public property typically represent government speech.
Governments have long used monuments to speak to the public. Since ancient times, kings, emperors, and other rulers have erected statues of themselves to remind their subjects of their authority and power. Triumphal arches, columns, and other monuments have been built to commemorate military victories and sacrifices and other events of civic importance. A monument, by definition, is a structure that is designed as a means of expression. When a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure. Neither the Court of Appeals nor respondent disputes the obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech.
Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the govern *471 ment accepts and displays to the public on government land. It certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated. And because property owners typically do not permit the construction of such monuments on their land, persons who observe donated monuments routinely — and reasonably — interpret them as conveying some message on the property owner’s behalf. In this context, there is little chance that observers will fail to appreciate the identity of the speaker. This is true whether the monument is located on private property or on public property, such as national, state, or city park land.
We think it is fair to say that throughout our Nation’s history, the general government practice with respect to donated monuments has been one of selective receptivity. A great many of the monuments that adorn the Nation’s public parks were financed with private funds or donated by private parties. Sites managed by the National Park Service contain thousands of privately designed or funded commemorative objects, including the Statue of Liberty, the Marine Corps War Memorial (the Iwo Jima monument), and the Vietnam Veterans Memorial. States and cities likewise have received thousands of donated monuments. See, e. g., App. to Brief for International Municipal Lawyers Association as Amicus Curiae 15a-29a (hereinafter IMLA Brief) (listing examples); Brief for American Legion et al. as Amici Curiae 7, and n. 2 (same). By accepting monuments that are privately funded or donated, government entities save tax dollars and are able to acquire monuments that they could not have afforded to fund on their own.
But while government entities regularly accept privately funded or donated monuments, they have exercised selectivity. An example discussed by the city of New York as amicus curiae is illustrative. In the wake of the controversy generated in 1876 when the city rejected the donor’s *472 proposed placement of a donated monument to honor Daniel Webster, the city adopted rules governing the acceptance of artwork for permanent placement in city parks, requiring, among other things, that “any proposed gift of art had to be viewed either in its finished condition or as a model before acceptance.” Brief for City of New York as Amicus Curiae 4-5 (hereinafter NYC Brief). Across the country, “municipalities generally exercise editorial control over donated monuments through prior submission requirements, design input, requested modifications, written criteria, and legislative approvals of specific content proposals.” IMLA Brief 21.
Public parks are often closely identified in the public mind with the government unit that owns the land. City parks— ranging from those in small towns, like Pioneer Park in Pleasant Grove City, to those in major metropolises, like Central Park in New York City — commonly play an important role in defining the identity that a city projects to its own residents and to the outside world. Accordingly, cities and other jurisdictions take some care in accepting donated monuments. Government decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture. The monuments that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech.
IV
A
In this case, it is clear that the monuments in Pleasant Grove’s Pioneer Park represent government speech. Although many of the monuments were not designed or built by the City and were donated in completed form by private entities, the City decided to accept those donations and to display them in the Park. Respondent does not claim that *473 the City ever opened up the Park for the placement of whatever permanent monuments might be offered by private donors. Rather, the City has “effectively controlled” the messages sent by the monuments in the Park by exercising “final approval authority” over their selection. Johanns, 544 U. S., at 560-561. The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park; it has taken ownership of most of the monuments in the Park, including the Ten Commandments monument that is the focus of respondent’s concern; and the City has now expressly set forth the criteria it will use in making future selections.
B
Respondent voices the legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint. Respondent’s suggested solution is to require a government entity accepting a privately donated monument to go through a formal process of adopting a resolution publicly embracing “the message” that the monument conveys. See Brief for Respondent 33-34, 57.
We see no reason for imposing a requirement of this sort. The parks of this country contain thousands of donated monuments that government entities have used for their own expressive purposes, usually without producing the sort of formal documentation that respondent now says is required to escape Free Speech Clause restrictions. Requiring all of these jurisdictions to go back and proclaim formally that they adopt all of these monuments as their own expressive vehicles would be a pointless exercise that the Constitution does not mandate.
In this case, for example, although respondent argues that Pleasant Grove City has not adequately “controlled] the message,” id., at 31, of the Ten Commandments monument, the City took ownership of that monument and put it on per *474 manent display in a park that it owns and manages and that is linked to the City’s identity. All rights previously possessed by the monument’s donor have been relinquished. The City’s actions provided a more dramatic form of adoption than the sort of formal endorsement that respondent would demand, unmistakably signifying to all Park visitors that the City intends the monument to speak on its behalf. And the City has made no effort to abridge the traditional free speech rights — the right to speak, distribute leaflets, etc. — that may be exercised by respondent and others in Pioneer Park.
What respondent demands, however, is that the City “adopt” or “embrace” “the message” that it associates with the monument. Id., at 33-34, 57. Respondent seems to think that a monument can convey only one “message”— which is, presumably, the message intended by the donor— and that, if a government entity that accepts a monument for placement on its property does not formally embrace that message, then the government has not engaged in expressive conduct.
This argument fundamentally misunderstands the way monuments convey meaning. The meaning conveyed by a monument is generally not a simple one like “‘Beef. It’s What’s for Dinner.’ ” Johanns, supra, at 554. Even when a monument features the written word, the monument may be intended to be interpreted, and may in fact be interpreted by different observers, in a variety of ways. Monuments called to our attention by the briefing in this case illustrate this phenomenon.
What, for example, is “the message” of the Greco-Roman mosaic of the word “Imagine” that was donated to New York City’s Central Park in memory of John Lennon? See NYC Brief 18; App. to id., at A5. Some observers may “imagine” the musical contributions that John Lennon would have made if he had not been killed. Others may think of the lyrics of the Lennon song that obviously inspired the mosaic *475 and may “imagine” a world without religion, countries, possessions, greed, or hunger.[2]
Or, to take another example, what is “the message” of the “large bronze statue displaying the word ‘peace’ in many world languages” that is displayed in Fayetteville, Arkansas?[3]
These text-based monuments are almost certain to evoke different thoughts and sentiments in the minds of different observers, and the effect of monuments that do not contain text is likely to be even more variable. Consider, for exam- *476 pie, the statue of Pancho Villa that was given to the city of Tucson, Arizona, in 1981 by the Government of Mexico with, according to a Tucson publication, “a wry sense of irony.”[4] Does this statue commemorate a “revolutionary leader who advocated for agrarian reform and the poor” or “a violent bandit”? IMLA Brief 13.
Contrary to respondent’s apparent belief, it frequently is not possible to identify a single “message” that is conveyed by an object or structure, and consequently, the thoughts or sentiments expressed by a government entity that accepts and displays such an object may be quite different from those of either its creator or its donor.[5] By accepting a privately donated monument and placing it on city property, a city engages in expressive conduct, but the intended and perceived significance of that conduct may not coincide with the thinking of the monument’s donor or creator. Indeed, when a privately donated memorial is funded by many small donations, the donors themselves may differ in their interpretation of the monument’s significance.[6] By accepting such a monument, a government entity does not necessarily endorse *477 the specific meaning that any particular donor sees in the monument.
The message that a government entity conveys by allowing a monument to remain on its property may also be altered by the subsequent addition of other monuments in the same vicinity. For example, following controversy over the original design of the Vietnam Veterans Memorial, a compromise was reached that called for the nearby addition of a flagstaff and bronze Three Soldiers statue, which many believed changed the overall effect of the memorial. See, e. g., J. Mayo, War Memorials as Political Landscape: The American Experience and Beyond 202-203, 205 (1988); K. Hass, Carried to the Wall: American Memory and the Vietnam Veterans Memorial 15-18 (1998).
The “message” conveyed by a monument may change over time. A study of war memorials found that “people reinterpret” the meaning of these memorials as “historical interpretations” and “the society around them changes.” Mayo, supra, at 8-9.
A striking example of how the interpretation of a monument can evolve is provided by one of the most famous and beloved public monuments in the United States, the Statue of Liberty. The statue was given to this country by the Third French Republic to express republican solidarity and friendship between the two countries. See J. Res. 6, 44th Cong., 2d Sess. (1877), 19 Stat. 410 (accepting the statue as an “expressive and felicitous memorial of the sympathy of the citizens of our sister Republic”). At the inaugural ceremony, President Cleveland saw the statue as an emblem of international friendship and the widespread influence of American ideals. See Inauguration of the Statue of Liberty Enlightening the World 30 (1887). Only later did the statue come to be viewed as a beacon welcoming immigrants to a land of freedom. See Public Papers of the Presidents, Ronald Reagan, Vol. 2, July 3,1986, pp. 918-919 (1989), Remarks at the Opening Ceremonies of the Statue of Liberty Centen *478 nial Celebration in New York, New York; J. Higham, The Transformation of the Statue of Liberty, in Send These To Me 74-80 (rev. ed. 1984).
C
Respondent and the Court of Appeals analogize the installation of permanent monuments in a public park to the delivery of speeches and the holding of marches and demonstrations, and they thus invoke the rule that a public park is a traditional public forum for these activities. But “public forum principles . . . are out of place in the context of this case.” United States v. American Library Assn., Inc., 539 U. S. 194, 205 (2003) (plurality opinion). The forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program. For example, a park can accommodate many speakers and, over time, many parades and demonstrations. The Combined Federal Campaign permits hundreds of groups to solicit donations from federal employees. See Cornelius, 473 U. S., at 804-805. A public university’s student activity fund can provide money for many campus activities. See Rosenberger, 515 U. S., at 825. A public university’s buildings may offer meeting space for hundreds of student groups. See Widmar v. Vincent, 454 U. S. 263, 274-275 (1981). A school system’s internal mail facilities can support the transmission of many messages to and from teachers and school administrators. See Perry Ed. Assn., 460 U. S., at 39, 46-47. See also Arkansas Ed. Television Comm’n v. Forbes, 523 U. S. 666, 680-681 (1998) (noting that allowing any candidate to participate in a televised political debate would be burdensome on “logistical grounds” and “would result in less speech, not more”).
By contrast, public parks can accommodate only a limited number of permanent monuments. Public parks have been used, “ ‘time out of mind,... for purposes of assembly, com *479 municating thoughts between citizens, and discussing public questions/ ” Perry Ed. Assn., supra, at 45 (quoting Hague, 307 U. S., at 515 (opinion of Roberts, J.)), but “one would be hard pressed to find a long tradition’ of allowing people to permanently occupy public space with any manner of monuments,” 499 F. 3d, at 1173 (Lucero, J., dissenting from denial of rehearing en banc).
Speakers, no matter how long-winded, eventually come to the end of their remarks; persons distributing leaflets and carrying signs at some point tire and go home; monuments, however, endure. They monopolize the use of the land on which they stand and interfere permanently with other uses of public space. A public park, over the years, can provide a soapbox for a very large number of orators — often, for all who want to speak — but it is hard to imagine how a public park could be opened up for the installation of permanent monuments by every person or group wishing to engage in that form of expression.
Respondent contends that this issue “can be dealt with through content-neutral time, place and manner restrictions, including the option of a ban on all unattended displays.” Brief for Respondent 14. On this view, when France presented the Statue of Liberty to the United States in 1884, this country had the option of either (1) declining France’s offer or (2) accepting the gift, but providing a comparable location in the harbor of New York for other statues of a similar size and nature (e. g., a Statue of Autocracy, if one had been offered by, say, the German Empire or Imperial Russia).
While respondent and some of its amici deride the fears expressed about the consequences of the Court of Appeals holding in this case, those concerns are well founded. If government entities must maintain viewpoint neutrality in their selection of donated monuments, they must either “brace themselves for an influx of clutter” or face the pressure to remove longstanding and cherished monuments. *480 See 499 F. 3d, at 1175 (McConnell, J., dissenting from denial of rehearing en banc). Every jurisdiction that has accepted a donated war memorial may be asked to provide equal treatment for a donated monument questioning the cause for which the veterans fought. New York City, having accepted a donated statue of one heroic dog (Balto, the sled dog who brought medicine to Nome, Alaska, during a diphtheria epidemic) [7] may be pressed to accept monuments for other dogs who are claimed to be equally worthy of commemoration. The obvious truth of the matter is that if public parks were considered to be traditional public forums for the purpose of erecting privately donated monuments, most parks would have little choice but to refuse all such donations. And where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place.
Respondent compares the present case to Capitol Square Review and Advisory Bd. v. Pinette, 515 U. S. 753 (1995), but that case involved a very different situation — a request by a private group, the Ku Klux Klan, to erect a cross for a period of 16 days on public property that had been opened up for similar temporary displays, including a Christmas tree and a menorah. See id., at 758. Although some public parks can accommodate and may be made generally available for temporary private displays, the same is rarely true for permanent monuments.
To be sure, there are limited circumstances in which the forum doctrine might properly be applied to a permanent monument — for example, if a town created a monument on which all of its residents (or all those meeting some other criterion) could place the name of a person to be honored or some other private message. But as a general matter, forum analysis simply does not apply to the installation of permanent monuments on public property.
*481 V
In sum, we hold that the City’s decision to accept certain privately donated monuments while rejecting respondent’s is best viewed as a form of government speech. As a result, the City’s decision is not subject to the Free Speech Clause, and the Court of Appeals erred in holding otherwise. We therefore reverse.

It is so ordered.

 Respondent’s brief describes the church and the Seven Aphorisms as follows:
“The Summum church incorporates elements of Gnostic Christianity, teaching that spiritual knowledge is experiential and that through devotion comes revelation, which ‘modifies human perceptions, and transfigures the individual.’ See The Teachings of Summum are the Teachings of Gnostic Christianity, http://www.summum.us/philosophy/gnosticism.shtml (visited Aug. 15, 2008).
“Central to Summum religious belief and practice are the Seven Principles of Creation (the ‘Seven Aphorisms’). According to Summum doctrine, the Seven Aphorisms were inscribed on the original tablets handed down by God to Moses on Mount Sinai. . . . Because Moses believed that the Israelites were not ready to receive the Aphorisms, he shared them only with a select group of people. In the Summum Exodus account, Moses then destroyed the original tablets, traveled back to Mount Sinai, and returned with a second set of tablets containing the Ten Commandments. See The Aphorisms of Summum and the Ten Commandments, http://www.summum.us/philosophy/teneommandments.shtml (visited Aug. 15, 2008).” Brief for Respondent 1-2.

 The lyrics are as follows:
“Imagine there’s no heaven It’s easy if you try No hell below us Above us only sky Imagine all the people Living for today ...
“Imagine there’s no countries It isn’t hal’d to do Nothing to kill or die for And no religion too Imagine all the people Living life in peace ...
“You may say I’m a dreamer But I’m not the only one I hope someday you’ll join us And the world will be as one
“Imagine no possessions I wonder if you can No need for greed or hunger A brotherhood of man Imagine all the people Sharing all the world ...
“You may say I’m a dreamer But I’m not the only one I hope someday you’ll join us
And the world will live as one.” J. Lennon, Imagine, on Imagine (Apple Records 1971).

 See IMLA Brief 6-7.

 The Presidio Trail: A Historical Walking Tour of Downtown Tucson, online at http://www.visittucson.org/includes/media/docs/DowntownTour.pdf (as visited Feb. 24, 2009, and available in Clerk of Court’s case file).

 Museum collections illustrate this phenomenon. Museums display works of art that express many different sentiments, and the significance of a donated work of art to its creator or donor may differ markedly from a museum’s reasons for accepting and displaying the work. For example, a painting of a religious scene may have been commissioned and painted to express religious thoughts and feelings. Even if the painting is donated to the museum by a patron who shares those thoughts and feelings, it does not follow that the museum, by displaying the painting, intends to convey or is perceived as conveying the same “message.”

 For example, the Vietnam Veterans Memorial Fund is a private organization that obtained funding from over 650,000 donors for the construction of the memorial itself. These donors expressed a wide range of personal sentiments in contributing money for the memorial. See, e.g., J. Scruggs & J. Swerdlow, To Heal a Nation: The Vietnam Veterans Memorial 23-28,159 (1985).

 See NYC Brief 2; App. to Brief for American Catholic Lawyers Association as Amicus Curiae 1a-10.