FILED

03/29/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 19, 2017 Session

## SINAN GIDER v. LYDIA HUBBELL

**Appeal from the Juvenile Court for Davidson County
No. 20085426, PT191027, PT202082      Sheila Calloway, Judge**

_____

**No. M2016-00032-COA-R3-JV**

_____

This case involves the modification of an agreed parenting plan under which the child's mother was the primary residential parent. After the father obtained an injunction to prevent Mother from homeschooling the child, the mother sought to obtain sole decision-making authority. The father then filed a petition seeking to be named primary residential parent and sole decision maker. The juvenile court granted both of the father's requests and denied the mother's request. The court also placed several limitations on the mother's visitation and enjoined her use of social media and from making disparaging remarks about the father to the child or in the child's presence. We conclude that certain of the restrictions placed on Mother's communications were overly broad or vague. Accordingly, we modify the injunction the juvenile court placed on Mother's communications. We affirm the judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified and Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Lydia Ann Hubbell, Antioch, Tennessee, pro se appellant.

Sarah L. Reist, Nashville, Tennessee, for the appellee, Sinan Gider.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

The short-term relationship of Lydia Hubbell ("Mother") and Sinan Gider ("Father") produced a child, Dilara. Shortly after Dilara's birth, in October 2008, the parties entered into a parenting agreement in which Mother was designated as primary residential parent and Father had parenting time 180 days out of the year. However, the parents did not follow the parenting plan and, instead, operated under an informal arrangement whereby each spent substantially equal time with the child.

### A. PETITIONS TO MODIFY THE CUSTODY ARRANGEMENT

On May 20, 2014, in the Juvenile Court for Davidson County, Tennessee, Father filed a pleading entitled, "Petition to Establish Parenting Plan and Deny Mother's Request to Homeschool the Child." In his petition, Father alleged that there had been a material change in circumstances due to Mother's unstable mental health, problems with her physical health, and the condition of Mother's home. He also alleged that homeschooling, as proposed by Mother, was not in the child's best interest. Father requested that he be named primary residential parent with Mother having parenting time two days a week or every other weekend. The same day, Father also filed a motion to enjoin Mother from homeschooling Dilara. Mother filed an answer/counter-petition on June 6, 2014, in which she sought sole decision-making authority for the child.

On July 15, 2014, a magistrate judge entered an order enjoining Mother from homeschooling the child based on concerns over Mother's lack of organizational skills and health. The order granted Father permission to apply to private school for the child, and if the parties could not agree upon where to send Dilara to school, they were to return to court for a hearing on the matter. After conducting a hearing, the magistrate entered an order on July 21, 2014, stating that Dilara would attend a public elementary school for which Mother was zoned.

Subsequently, Father filed a notice of nonsuit. The magistrate dismissed Father's petition without prejudice but kept its orders enjoining the Mother from homeschooling and ordering the child to attend public school in place. For her part, Mother filed a motion requesting to proceed as plaintiff on her request for sole decision-making authority and to homeschool the child, which was granted.

On January 5, 2015, the magistrate judge entered an order ruling upon Mother's counter-petition. The magistrate kept the previous order enjoining Mother from homeschooling in place and ordered parents to continue with joint decision-making. The

2

parents were also ordered to attend a co-parenting class. Thereafter, Mother filed a motion for rehearing with the juvenile court judge.

On February 24, 2015, Father filed a new petition to modify and/or establish a permanent parenting plan. Father again proposed that he be named primary residential parent, but this time, he proposed that Mother exercise parenting time from Saturday at 3:00 p.m. until Sunday at 3:00 p.m. and on Wednesdays after school from 3:00-6:00 p.m. This proposal represented a significant change from their prior informal parenting arrangement. Father also requested that he be granted sole educational decision-making authority for the child.

Mother's request to rehear and Father's petition to modify and/or establish a permanent parenting plan were combined and set for trial before a juvenile court judge. Pending trial, the court ordered that Father would exercise parenting time during the week and Mother would exercise parenting time every weekend from after school on Friday to 6:00 p.m. Sunday.

## B. PROOF AT TRIAL

The court held the trial over five days in April, May, and August. Prior to the trial, under a court order, Court Appointed Special Advocates ("CASA"), the child's Guardian ad Litem (the "GAL"), and the Tennessee Department of Children's Services ("DCS") evaluated Mother's home. The home was found to be "inappropriate for raising a child." Also, during the same time period, Mother was charged with stalking Father, and the Circuit Court of Davidson County, Tennessee entered an order of protection, which prohibited Mother from having contact with Father or the child for one year.

At trial, several witnesses testified, including Mother, Father, Mother's brother, two friends of Mother's, the child's kindergarten teacher, the school principal, and the CASA volunteer[1] assigned to the case. At the outset, Mother[2] stipulated:

My house is a mess. I've been on disability for twelve or thirteen years. I currently have physical health issues . . . . I have had [ ] very serious mental health issues with depression . . . . I'm stable now . . . [but] I will

---

[1] CASA volunteers are "specially trained community volunteers who are available to be appointed by the courts to advocate on behalf of abused and neglected children in judicial proceedings." *In re Audrey S.*, 182 S.W.3d 838, 854 n.9 (Tenn. Ct. App. 2005). The juvenile court may appoint a CASA volunteer to "conduct such investigation and make such reports and recommendations pertaining to the welfare of a child as the court may order or direct." Tenn. Code Ann. § 37-1-149(b)(2) (2014).

[2] Mother represented herself throughout the trial with the exception of the final day, when she did have counsel.

3

agree, I have a history of mental health issues: anxiety, depression, that sort of thing.

Mother went on to explain her desire to obtain sole decision-making authority, specifically concerning the child's education. She testified that the joint decision-making arrangement was no longer workable because of Father's unwillingness to communicate with Mother. She claimed that Father was "controlling and threatening" and that she often felt bullied by Father. Mother admitted, however, that Father is not a violent person. Mother stated that, while she valued Father's opinions and wanted his input, she did not want Father dictating Mother's home life and what she could do with the child during her parenting time.

According to Mother, she was the parent better equipped to make decisions in Dilara's best interest. She claimed more experience in meeting the needs of young children and to have spent more time actively engaged with Dilara. Mother described Father as not "engage[d] with Dilara to the same degree" and as not acknowledging that Dilara had "special educational needs."

Throughout her testimony, Mother indicated that she sought sole decision-making authority primarily because she still wished to homeschool Dilara. Mother called Kimberly Schletzer, a school psychologist, to testify concerning a psychological assessment she had performed on Dilara. According to Ms. Schletzer, Dilara was intellectually gifted and academically advanced. Mother testified that, because she was academically advanced, Dilara's needs were not being met in public school. Specifically, Mother believed that the child was bored at school and developed behavior problems as a result.

Mother felt that her past experience in early childhood education and particular understanding of her child's needs made homeschooling the best option for Dilara. Additionally, Mother testified that, before Dilara started kindergarten, Mother personally taught the child how to read and write at home.[3] According to Mother, a flexible homeschooling schedule would give Dilara more time to explore her talents and develop skills.

When questioned by Father's counsel, Mother conceded that she had shared details with the child about the custody case. She further admitted to discussing other topics of a sensitive nature with the child. When asked if she believed these topics were appropriate to discuss with a child, Mother said, "I do . . . . I don't think there's anything wrong with saying that." She testified that she did not believe there is any age too young to talk to a child about most things.

---

[3] Mother referred to teaching the child to read and write as "homeschooling," though the child was not yet of school age.

4

Concerning the condition of her home, Mother conceded that "my strength isn't spending time on my house." She admitted that her home was messy and described the living environment as "minimally adequate." However, Mother testified that the living environment was still functional, and she felt that there were no threats to the child's health or safety.

As to her health, Mother emphasized that her health problems had never prevented her from adequately meeting Dilara's needs, and according to Mother, she was "mentally stronger" than she had ever been. She testified that, although her health problems kept her from obtaining employment outside the home, she was still able to personally care for Dilara and get her where she needed to go.

Still, Mother testified to chronic health issues. In 2012, she suffered from a "severe chronic fatigue episode" for eight months. She conceded that most days she was in pain and that the stresses of litigation had led to more health problems. According to Mother, she struggled with her health, on average, two to three days per week, and on her worst days, she could only get out of bed for 10 or 15 minutes at a time. At times she had to cancel plans at the last minute due to her health. She also admitted that, despite the close distance between her home and Dilara's school, the child was occasionally dropped off late.

Regarding the visitation schedule, Mother felt it should remain the same as under the previous informal arrangement, whereby the parents enjoyed substantially equal parenting time.

Mother called her brother, Tod[4] Missick, to testify concerning the child's relationship with Mother. Mr. Missick testified that Mother's health issues did not prevent her from meeting the child's needs and that he had personally witnessed Mother's involvement in teaching Dilara to read and write. He also explained that Dilara seemed to enjoy spending time at Mother's home and that her needs were well met in both parents' homes. Though he agreed that Mother's house was messy, he had no concern for Dilara's safety.

Mother also called Karen Shearer and Kathy McGee, two friends of Mother, to testify. Both women had known Mother for several years and testified that Mother frequently attended church with Dilara. Ms. Shearer and Ms. McGee each testified to teaching Dilara in Bible class and found her to be well behaved. Additionally, Ms. Shearer stated that Dilara got along well with other children. Ms. McGee explained that she had witnessed Mother's positive relationship with the child, and according to

_____

[4] In the statements of evidence approved by the juvenile court, the first name of Mother's brother is spelled "Tod" by Mother and spelled "Todd" by Father.

Ms. McGee, Dilara was healthy and well-cared for despite Mother's health conditions. Ms. McGee acknowledged the cluttered condition of Mother's home but testified that she did not feel the home was unhealthy or unsafe. She further explained that she was familiar with the homeschooling program that Mother sought to use and opined that "it would be good for Dilara to be homeschooled by Mother."

Next, Father testified to his belief that Mother's health had affected her ability to care for the child. He stated that he often had to pick Dilara up from Mother's home to take her to school, even during Mother's parenting time. He claimed that Mother had, on occasion, threatened to harm herself and had also experienced anxiety attacks during her parenting time, forcing Father to have the child picked up early.

Father wished to be named the primary residential parent and sole decision maker because he could provide the child with "more normalcy," which he believed was in the child's best interest. He emphasized that Mother continued to share inappropriate information and behave irresponsibly in the child's presence. Father stated that his work schedule was flexible, which would allow him to spend sufficient time with Dilara. Father further asserted that the parties' joint decision making arrangement no longer worked, mainly because he and Mother could not agree on the homeschooling issue. He believed that the condition of Mother's home, her mental condition, and her organizational skills compromised Mother's ability to educate the child. He also disagreed with Mother on disciplinary matters.

Father called both the child's kindergarten teacher and school principal to testify concerning Dilara's behavior at school and their interactions with Mother. Jennifer Boyette, Dilara's teacher, testified that Dilara struggled to behave properly in groups with other students and would often show aggression by screaming. Ms. Boyette also stated that Mother had, in the past, spoken to her in a degrading manner and bombarded her with frequent emails.

Andrea Woodard, the school principal, testified that Dilara had become aware of the tension between her parents. Ms. Woodard explained that at school Dilara discussed the fact that Mother had shared details of the custody battle and other sensitive topics with Dilara. According to Ms. Woodard, Dilara exhibited a "high level of anger" and had "physically lashed out against her peers. As a result, Ms. Woodard had several conversations with Mother concerning inappropriate topics to discuss with children.

Ms. Woodard opined that homeschooling was not suitable for Dilara because she needed to be around children her own age for social and emotional development, as she tended to struggle with such interactions. Ms. Woodard also felt that the structure of public school benefited Dilara. She testified that her school offered programs for gifted children and that Dilara was, at that time, permitted to attend first grade for reading.

6

Finally, Tricia Reynolds, the CASA volunteer assigned to the case, testified concerning Mother's home visit and Mother's behavior. Ms. Reynolds did not believe that Mother's house was an appropriate environment to raise a child. She explained that the home had three bedrooms but only the living room was actually used. The other rooms were "stuffed" with Mother's belongings, and trash was scattered throughout the home. Additionally, at least one bedroom and the basement were completely inaccessible. According to Ms. Reynolds, the living room contained one bed in which both Mother and the child slept and occasionally did school work. She testified that she recommended homemaker services to Mother and offered to help Mother get her home in order, but Mother refused assistance.

Still, Ms. Reynolds's greatest concern was Mother's inability to control what she said to Dilara. She explained that Mother discussed matters with Dilara that were inappropriate and that could have a negative psychological impact on the child. Ms. Reynolds also testified that Mother's behavior provoked concern that she was not taking her medication and that it was not in the child's best interest to remain in Mother's home.

C. JUVENILE COURT'S RULING

On October 15, 2015, the juvenile court entered an order granting Father's petition. After noting that the parties had stipulated that there had been a material change of circumstance, the court addressed the applicable statutory, best interest factors. Based on its analysis of the child's best interest, the court determined that Father should be designated primary residential parent and have sole decision-making authority.

The juvenile court ordered several restrictions on Mother's visitation, including: (1) subjecting Mother's parenting time to the terms of the order of protection; (2) requiring, initially, therapeutic visitation with a "certified moderator"; and (3) conditioning unsupervised visits on Mother completing two months of therapeutic visits and a determination by the agency conducting the therapeutic visits that Mother was ready for unsupervised visits. Once unsupervised visits commenced, the order provided that the visits could not be overnight until the condition of Mother's home was significantly improved. The court also ordered the CASA volunteer and the GAL to remain on the case through January 2016 and to assist Mother "in getting to where she needs to be."

Finally, the court enjoined Mother from referencing Father on social media or making disparaging remarks about Father to the child or to others if in the child's presence. Mother was further enjoined from discussing the custody proceedings and other "adult-only issues," with the child.

Thereafter, Mother filed a motion entitled, "Motion for Reconsideration and Clarification." The juvenile court granted the motion and clarified that its prior order was a final order and as such was appealable. The court also admonished Mother regarding social media postings regarding either Dilara or Father.

## II. ANALYSIS

Mother, acting pro se on appeal, argues that the juvenile court erred in modifying the parties' parenting agreement by naming Father the primary residential parent and by granting Father sole decision-making authority. Mother also argues that the juvenile court improperly restricted her visitation and improperly placed restrictions on her communications. We consider each of these issues in turn.

### A. STANDARD OF REVIEW

As we have often noted, "[c]ustody and visitation determinations often hinge on subtle factors." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Consequently, we "are reluctant to second-guess a trial court's decisions" on such matters. *Id.* We review the trial court's factual findings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013). We review the trial court's conclusions of law de novo with no presumption of correctness. Tenn. R. App. P. 13(d).

### B. MODIFICATION OF PARENTING AGREEMENT

The juvenile court granted Father's request to modify the parenting agreement to name him the primary residential parent and also named Father the sole decision maker. Each of these issues falls under the umbrella of custody modification.[5] *See Colley v. Colley*, No. M2014-02495-COA-R3-CV, 2016 WL 3633376, at *10 (Tenn. Ct. App. June 28, 2016), *perm. app. denied*, (Nov. 17, 2016) (analyzing a parent's request for sole decision-making authority under the material change analysis).

Tennessee Code Annotated § 36-6-101 addresses custody determinations and modifications. Regarding requests for a change of custody, the statute provides as follows:

---

[5] Mother erroneously frames her argument, in part, by focusing on the injunction preventing her from homeschooling the child, which was contained in a 2014 order not before this Court. In the October 2015 order—the order that Mother has appealed—the juvenile court modified the parenting agreement to make Father the sole decision maker. Because the parties' only dispute with regards to decision making involves the child's education, we interpret Mother's argument as an additional objection to the court's modification of the custody arrangement.

8

If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2016). Thus, the threshold issue in considering a petition to modify the parties' parenting arrangement is whether a material change in circumstance has occurred. *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007).

Only if a material change in circumstance has occurred do we consider whether a modification is in the child's best interest. *Armbrister*, 414 S.W.3d at 705. "The determinations of whether a material change of circumstances has occurred and where the best interests of the child lie are factual questions." *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Decisions on questions related to custody and visitation should be directed towards promoting the children's best interests by placing them in an environment that will best serve their physical and emotional needs. *Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004); *Gaskill*, 936 S.W.2d at 630.

The parent requesting a change in the primary residential parent has the burden of proving the threshold issue of a material change in circumstance by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2)(B). But, in the case before us, both parties stipulated that a material change had occurred, and Mother does not contest the juvenile court's finding of a material change in circumstances. Instead, Mother argues that the court erred in determining the child's best interest.

In determining a child's best interest, courts must consider a non-exclusive list of factors found at Tennessee Code Annotated § 36-6-106(a).[6] Tenn. Code Ann. §§ 36-6-

---

[6] The court shall consider all relevant factors applicable to the case, including:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and

9

404(b), -405(a) (2014). The best interest analysis is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Under the analysis, the trial court must determine which parent is "comparatively more fit than the other to be the custodial parent." *Id.*

Here, the juvenile court found several of the statutory factors favored Father over Mother:

> 36-6-106(a)(2): Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents . . . .

---

caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . . . ;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (2014).

10

The Court finds that this factor favors Father. Throughout the pendency of this case, it has been clear that the Mother has continuously failed to follow through on court orders. Additionally, Mother was charged with stalking and an order of protection was granted against her. Further, Mother stated in her testimony on several different occasions that if she had researched and had decided upon something, then Father had to agree with her. There was not room for Mother to agree with Father because, according to the Mother, Father didn't do the same amount of research . . . . According to Mother, this meant that Father was wrong . . . . Mother is not as willing and able to facilitate and encourage a close relationship with the child and the Father.

. . . .

36-6-106(a)(4): The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care.

The court finds that this factor favors the Father. The court does not want to make a ruling based on the Mother's disability. However[,] the Mother did testify that when she is sick, . . . it is difficult when the child is with her. The child has to stay in the bed with Mother and do her homeschooling [ ] in bed. Mother has also had a lot of car issues. Also, Father has a stable job and has shown that he can provide for the child on a more stable basis.

. . . .

36-6-106(a)(8): The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child.

The Court finds that this factor favors the Father as well. The Court believes that Mother does have some mental health issues that need to be actively treated. There has been some testimony as to whether or not Mother believes that she has mental health issues or whether she follows the recommendations of providers. The Court believes that the Mother needs to follow these instructions more closely.

. . . .

36-6-106(a)(10): The importance of continuity in the child's life and length of time the child has lived in a stable, satisfactory environment.

11

The Court finds that this factor [ ] slightly [favors] Father due to the issues and concerns [with] the Mother's house based on the accounts of both [DCS] and CASA. The Mother's current living arrangement is not satisfactory for a child.

. . . .

36-6-106(a)(15): Any other factors deemed relevant by the court.

Based on the recommendations of CASA, and based on the arguments by the Guardian Ad Litem, the Court believes that Father has shown that he is in a better position to be more stable and to more adequately care for the child at this time.

Despite these findings, the juvenile court noted that the child had a strong relationship with both parents and that there was "no question that both parties absolutely love and adore the child . . . and want the best for her." The court did not find any of the best interest factors weighed in favor of Mother.

Unsurprisingly, Mother takes the position that the court erroneously weighed the above factors in Father's favor. According to Mother, Factor 2 should not favor Father because she never kept Father from seeing Dilara, and in fact, she sought to keep in place the agreement allowing the parties to enjoy essentially equal parenting time. Factor 2 concerns

[e]ach parent's . . . past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. . . . [T]he court shall consider the likelihood of each parent . . . to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent . . . denying parenting time to either parent in violation of a court order[.]

Tenn. Code Ann. § 36-6-106(a)(2).

We disagree with Mother's assessment. The juvenile court properly considered Mother's unwillingness to cooperate with Father in making educational decisions and her history of disregarding orders of the court. The evidence also demonstrates that Mother continued to share inappropriate information with the child concerning the parents' relationship and the details of the custody dispute. We, therefore, agree with the juvenile court's finding that Factor 2 favored Father over Mother.

12

Mother also argues that the court should not have credited Father under Factor 8, which concerns the moral, physical, mental, and emotional fitness of each parent as it relates to their ability to parent the child. *Id.* § 36-6-106(a)(8). Though she admitted to having physical and mental health issues, Mother contends that her health has never affected her ability to parent Dilara. In fact, Mother suggests that her disability has the positive effect of allowing her to spend more time at home with the child.

The juvenile court found otherwise, and the evidence does not preponderate against such a finding. By her own admission, Mother's chronic fatigue episodes often left her unable to get out of bed in the mornings. Mother's mental instability was evidenced by the condition of her home[7] and her refusal to acknowledge the inappropriate nature of her discussions with the child. The record also demonstrates that Mother made a habit of sending Father inappropriate and occasionally threatening emails.[8] Further, the CASA volunteer testified that Mother's behavior "provoked concern that she may not be taking her medications."

Nonetheless, Mother contends that the court failed to consider that she has equally provided for Dilara's needs in the past, her status as the child's primary caregiver, and the child's relationships with Mother's family and church friends. While recognizing that Dilara has a strong bond with Mother and has primarily resided with Mother, the evidence does not preponderate against the juvenile court's finding that Father has demonstrated a greater willingness to support the child's relationship with both parents. The factors Mother describes, while important, do not outweigh the considerations discussed above, particularly the unsuitability of Mother's home and her apparent inability or unwillingness to control the content of her conversations with the child.

Thus, from our review of the record, the evidence does not preponderate against the court's factual findings, and we discern no error in the weighing of the statutory

---

[7] Mother argues that the trial court erroneously faulted her for the "undesirable" condition of her home. While agreeing that the state of her home is not ideal, Mother asserts that it is "minimally adequate." We note the opinions stated by Mother's witnesses that the condition of the home was not unsafe or unhealthy, but just because a home is not detrimental to a child's health does not necessarily mean it is adequate for raising a child. The photographs of Mother's home in the record together with the testimony of the CASA volunteer and Father amply support the juvenile court's finding that Mother's home was not suitable for raising a child.

[8] For example, in February 2015, Mother sent Father an email stating as follows:

For the past few days, since you have been holding Dilara hostage, I have been kind of fantasizing about sitting on your chest and punching you in the face over and over and over again . . . [but] I will not lay a hand on you. This is much better than wanting you dead like I did 2 ½ years ago. If I have any true violent urges, I will go on medication before I act on them.

factors. And as the parents were unable to exercise joint decision making, it was also in the child's best interest to grant Father sole decision-making authority. *See* Tenn. Code Ann. § 36-6-407(b)(2) (2014) ("The court shall order sole decision-making to one (1) parent when it finds that . . . [b]oth parents are opposed to mutual decision making."); *Duke v. Duke*, No. M2013-00624-COA-R3-CV, 2014 WL 4966902, at *24 (Tenn. Ct. App. Oct. 3, 2014).

## C. RESTRICTIONS ON MOTHER'S VISITATION

Next, Mother challenges the juvenile court's decision to limit her visitation with the child. As outlined above, the court placed several restrictions on Mother's visitation, gradually transitioning from supervised to unsupervised visits and allowing increased parenting time only after Mother improved the condition of her home. Mother argues that the court did not make sufficient factual findings to justify these restrictions.

This Court has previously discussed the process a trial court must follow before it limits, suspends, or terminates a non-custodial parent's visitation:

> First, the trial court must make a specific finding, based on definite evidence, that visitation would cause harm to the child. *Eldridge* [*v. Eldridge*], 42 S.W.3d [82,] 85 [(Tenn. 2001)]. After making this finding, the trial court must then determine the least restrictive visitation plan as available and practical. *Bueno* [*v. Todd*], [No. W2005-02164-COA-R3-CV,] 2006 WL 2106006 at *6 [(Tenn. Ct. App. July 31, 2006)]. In determining the least restrictive visitation plan, the trial court must make specific findings, based on definite evidence, that any less restrictive visitation would be harmful to the child. *Id.* The burden of proof on both the issue of harm and the least restrictive visitation plan, is on the party seeking to restrict visitation. *Id.* In making these determinations, the trial court must bear in mind that "it is the public policy of the state of Tennessee that courts *shall* grant parenting time with the non-custodial parent unless visitation will harm the child." *Kershaw v. Kershaw*, No. M2009-00151-COA-R3-CV[, 2009 WL 4039262, at *3] (Tenn. Ct. App. November 20, 2009) (emphasis added).

*Rudd v. Rudd*, No. W2009-00251-COA-R3-CV, 2009 WL 4642582, at *7 (Tenn. Ct. App. Dec. 9, 2009)

In his brief, Father concedes that the juvenile court's order did not meet the standard of specificity summarized in *Rudd v. Rudd*. Still, Father contends that the court's factual findings combined with the statements of the evidence in the record clearly support the decision to limit Mother's visitation. We agree. The record and the juvenile court's findings support the conclusion that Mother's unrestricted visitation

would cause harm to the child and that the limitations ordered by the court are the least restrictive visitation plan available and practical.

After the evaluation performed on Mother's home by DCS, CASA, and the GAL, the house was found to be "inappropriate for raising a child." Additionally, the CASA volunteer testified that Mother's discussion of inappropriate topics with Dilara could have a negative psychological impact on the child. In fact, the child's teacher and principal attributed the child's behavior problems at school to Mother's actions.

Moreover, the limitations placed on Mother's visitation were the least restrictive option for several reasons. First, ordering supervised visitation was necessary because the order of protection entered against Mother, which was still in place at the time the juvenile court's order was entered, prevented her from having contact with the child. Supervised visitation was also appropriate, at least for a time, due to Mother's apparent mental instability and her practice of discussing the custody dispute and other sensitive topics with the child. Finally, placing limitations on the amount of time the child spent in Mother's home was also necessary until Mother could demonstrate that she improved the home's condition. We further note that these limitations on Mother's visitation were not permanent. After two months of therapeutic, supervised visits, Mother would be permitted to exercise unsupervised visitation, which could become overnight visits when she improved the condition of her home.

### D. RESTRICTIONS ON MOTHER'S COMMUNICATIONS

Mother next argues that the juvenile court improperly restricted her communications with her daughter and her online communications. The court's order restricted Mother's use of social media and enjoined her from making disparaging remarks about Father to the child or in the child's presence or discussing the custody proceedings with the child.[9] Mother appears to argue that the injunction violates both the United States Constitution and the Tennessee Constitution as an impermissible prior restraint on speech.

This Court succinctly explained prior restraints in *In re Conservatorship of Turner* as follows:

> An impermissible "prior restraint" exists when the exercise of First Amendment rights depends upon prior approval of public officials. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001), *cert. denied*[,] 535 U.S. 1073, 122 S. Ct.

---

[9] We also briefly address Mother's argument that Father's counsel should be sanctioned for requesting such an injunction. As Father points out, Mother failed to state any legal ground by which it would be appropriate for this Court to issue sanctions. Accordingly, we decline to do so.

1952, 152 L. Ed. 2d 855 (2002). A system creating prior restraints bears a heavy presumption against its constitutional validity. *Id.* (citing *Freedman v. Maryland*, 380 U.S. 51, 85 S. Ct. 734, 13 L. Ed. 2d 649 (1965)). In the context of protected speech, "'prior restraint' is a label used in constitutional law to describe administrative or judicial orders that forbid a communication when issued in advance of the time that the communication is to occur: Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated." 2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 11:24 Injunctions–Prior Restraint Rule (2d ed.). Accordingly, the First Amendment of the United States Constitution, and Article I, Section 19 of the Tennessee Constitution, provide broad protections to prevent the abridgment of a person's right to freedom of speech. These protections require the application of strict scrutiny review when a court is presented with the question of whether a person's fundamental rights, such as freedom of speech, have been infringed. *See generally San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 16, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). Strict scrutiny requires that the restraint on speech be "narrowly tailored to serve a compelling governmental interest." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009).

*In re Conservatorship of Turner*, No. M2013-01665-COA-R3-CV, 2014 WL 1901115, at *8 (Tenn. Ct. App. May 9, 2014).

Here, the juvenile court's order is clearly a prior restraint. Specifically, the case involves prior restraint on a parent's speech in the context of a child custody dispute. Though we have uncovered no Tennessee cases directly on point, we are guided by the decisions of our sister states. In cases such as this one, the danger of physical or emotional harm to the child must be balanced against the parent's First Amendment rights. *Baskin v. Hale*, 787 S.E.2d 785, 791 (Ga. Ct. App. 2016), *cert. denied*, (Jan. 17, 2017); *see also In re T.T.*, 779 N.W.2d 602, 620 (Neb. Ct. App. 2009). In doing so, courts must consider whether the activity restrained poses a "clear and present danger or a serious and imminent threat to a protected competing interest." *In re R.J.M.B.*, 133 So. 3d 335, 343 (Miss. 2013) (quoting *United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000)) (internal quotations omitted).

In this case, the juvenile court restricted certain types of communications about Father and prohibited Mother from discussing certain topics with or in the presence of the child. Specifically, the order restricted Mother from referencing Father "at all on social media" or making disparaging remarks about Father on social media. The order also provided as follows:

Mother is enjoined from having any conversations with the child about the court proceedings or about topics which are adult-only issues . . . .

. . . Mother is enjoined from making any disparaging remarks about Father to the child or in the presence of the child . . . .

As discussed above, Mother's conversations with the child were unquestionably harmful, as were Mother's social media posts. By her own admission, Mother often posted the details of the parties' custody dispute on social media for the purpose of communicating with Father. She testified:

[Father will] talk about me but he won't talk to me. And he said he doesn't want to read my emails. He's told [his attorney] not to read my emails. I put stuff on Facebook and make it public just so he'll see it because I know . . . they'll read my Facebook posts. So they can know how I'm feeling.

Mother also posted disparaging remarks about Father online, occasionally referring to him as "Dilara's father" and "my Turkish enemy." For example, while the custody proceedings were still ongoing, Mother posted several negative and unsubstantiated claims about Father's character, such as her post in December 2014, which stated:

Getting kind of excited about court on Monday. It will be very interesting to see how [Father] reacts to my questions when he can't get away or threaten to call the police and have me arrested because I want to talk to him about Dilara. I hope the Court puts an end to this madness.

In imposing the injunction at issue, the juvenile court's focus was clearly on protecting the interests of the child. Here, the evidence does not preponderate against the juvenile court's findings that the certain of Mother's communications were not in the child's best interest or harmful to the child.

Under these facts, it is entirely proper for the juvenile court to restrict Mother from making disparaging and clearly defamatory remarks about Father online or to the child or in the presence of the child. *See In re T.R.*, 556 N.E.2d 439, 454 (Ohio 1990) ("[A] juvenile court, which is not presumptively open, has the power to control extrajudicial comments by the litigants, provided the restrictions are consistent with [constitutional standards]."); *In re Conservatorship of Turner*, 2014 WL 1901115, at *20 (holding that defamatory speech may be enjoined if narrowly tailored to limit the prohibited speech to that which has been determined to be false). Such remarks are "not worthy of constitutional protection." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). And we conclude that the restrictions placed on Mother in this regard do not unduly burden constitutionally protected speech. *See In re Brianna B.*, 785 A.2d 1189, 1195 (Conn. App. Ct. 2001) (concluding a confidentiality order did not violate adoptive

17

mother's right to free speech where the trial court "did not absolutely bar any discussion of the proceedings, permitting the petitioner to discuss the proceedings with a child advocate or her legislative representative.")  In light of their adverse effect on Dilara, the record also supports restricting Mother's communication to the child about the court proceedings and other topics specifically identified in the order.  The demonstrated harm outweighs Mother's free speech rights.

Nonetheless, we conclude certain of the restrictions placed on Mother's communications were overbroad or vague.  The prohibition against any mention of Father by Mother on social media would prohibit even the most benign reference to Father.  And the prohibition against Mother discussing "adult-only issues" with her child leaves a reasonable basis for doubt as to what topics, beyond those specifically mentioned in the order, Mother may not discuss.  Consequently, we modify the juvenile court's injunction to remove the prohibitions against 1) any reference by Mother to "Father at all on social media" or 2) discussions of "adult-only issues" beyond those topics specifically referenced in the injunction.  Our ruling, however, does not preclude the juvenile court from expanding its injunction in the future to cover additional topics provided the restraints on Mother are supported by adequate factual findings and are narrowly tailored to limit the prohibited speech.

### III. CONCLUSION

In light of the foregoing, we conclude that the juvenile court did not err in naming Father the primary residential parent and sole decision maker.  Although the juvenile court's order lacked specificity, in the unique circumstances of this case and based on our review of the record, the limits placed on Mother's visitation were appropriate.  We also conclude that the prohibitions against any reference by Mother to Father on social media and discussing "adult-only issues" with the child were overly broad or vague.  However, the restrictions placed on Mother's communications were appropriate in all other respects. We, therefore, affirm the decision of the juvenile court as modified.

_____
W. NEAL MCBRAYER, JUDGE

18