IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Italian Sons and Daughters of America, :
                       Appellant          :
                                             :
           v.                      :    No. 1124 C.D. 2022
                                             :
City of Pittsburgh and Mayor        :    Argued: October 11, 2023
William Peduto                      :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE STACY WALLACE, Judge

OPINION
BY JUDGE McCULLOUGH                 FILED: April 19, 2024

The Italian Sons and Daughters of America (ISDA) appeals from three orders entered by the Court of Common Pleas of Allegheny County (trial court), one on November 17, 2021, and two on September 30, 2022. The orders, respectively, (1) denied ISDA's motion to recuse the presiding trial court judge, the Honorable John T. McVay, Jr. (trial court judge); (2) on preliminary objections, dismissed ISDA's First Amended Complaint against the City of Pittsburgh (City) and former Mayor William Peduto (Mayor Peduto) (with the City, Appellees),[1] which asserted claims related to Mayor Peduto's attempts to remove a statue of Christopher Columbus (Statue) from the City's Schenley Park; and (3) dismissed as moot ISDA's motion for leave to file a second amended complaint. On appeal to this Court, ISDA chiefly argues that the trial court erred in dismissing the First Amended Complaint at the preliminary objection

_____

[1] During the pendency of the litigation below, the City's current mayor, Ed Gainey, began his term of office.

stage based on the "government speech" doctrine.  After thorough review, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

Because the trial court dismissed ISDA's First Amended Complaint on preliminary objections, we consider the following facts as they are pled in the First Amended Complaint and, as pertinent, established in the record below.

In 1955, the City enacted Ordinance No. 198,[2] which provides, in relevant part, as follows:

No. 198

**AN ORDINANCE**

Granting unto the Sons of Columbus of America, Inc. [(Sons of Columbus)], and its successors, the right to erect and construct a memorial of granite and bronze of Christopher Columbus in such place and location in Schenley Park as shall be designated by the Director of [the Department of] Parks and Recreation after approval of the plans for the memorial and its location by the Director of the Department of Parks and Recreation, the Art Commission and the City Planning Commission.

***The Council of the City [ ] hereby enacts as follows:***
[SECTION 1.] The Sons of Columbus[ ], and its successors[,] is hereby granted the right to erect and construct a memorial of granite and bronze of CHRISTOPHER COLUMBUS at such place and location in Schenley Park, City of Pittsburgh, as shall be designated by the Director of the Department of Parks and Recreation after approval of the design and location of the memorial by the said Director, the City Planning Commission of the City [ ], and the Art Commission of the City [ ].  The erection of the memorial shall be under the supervision[,] and subject to the direction and control of[,] the Director of the Department of Parks and Recreation.

---

[2] City of Pittsburgh, Pa., Ordinance No. 198 (Ordinance), Ordinance Book Vol. 60, p. 31 (May 26, 1955).

SECTION 2. The Sons of Columbus [ ], shall bear the full cost and expense of the construction of the said memorial.

SECTION 3. Upon completion of the construction of the memorial and approval thereof by the Director of the Department of Parks and Recreation, the maintenance shall be borne by the City [ ].

[SECTION 4.] That any [o]rdinance or part of [o]rdinance, conflicting with the provisions of this Ordinance, be and the same is hereby repealed so far as the same affects this Ordinance.

Ordained and enacted into a law in council, this [16th] day of [May], A.D. 19[55.]

(Reproduced Record (R.R.) at 00017a-18a) (emphasis in original). The Ordinance is signed by the President of Council, Clerk of Council, then-Mayor David L. Lawrence, and then-Mayor Lawrence's assistant secretary. *Id.* at 00018a. The Sons of Columbus commissioned the construction of the Statue, which was completed and placed in Schenley Park in 1958.

On August 3, 2020, Robert A. Indovina, the Chair of the City's Art Commission (Chairperson Indovina), sent a letter to Mayor Peduto advising that the Art Commission intended to initiate public proceedings pursuant to former Section 175.04 of the City's Code of Ordinances (Code)[3] to consider the Statue's future. (R.R.

---

[3] City of Pittsburgh, Pa., Code of Ordinances (2024), *available at* https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=COOR_TITONEAD _ARTIXBOCOAU_CH175PUARCIDECO (last visited April 18, 2024). Section 175.04, now repealed, provided as follows:

> No existing work of art in the possession of the City shall be removed, relocated or altered in any way without the similar approval of the Art Commission. Any work of art shall be removed, relocated or altered, in any way that may be ordered, by a vote passed, and approved in writing, by two-thirds (⅔) of all the members of the [Art] Commission, unless the work of art is attached to a portion of a building or other structure in process of demolition. In case the immediate removal or relocation of any existing work of art is deemed necessary by the proper

**(Footnote continued on next page…)**

3

at 00386a.)  In response, Mayor Peduto sent a letter to Chairperson Indovina indicating that, although final decision-making authority over the Statue's future remained with the mayor, he nevertheless wanted a recommendation from the Art Commission regarding how to proceed.  (R.R. at 00388a.)  Mayor Peduto directed the Art Commission to conduct a public review regarding the Statue's future, which review would include (1) receiving public comment via an online portal, (2) conducting a special on-the-record hearing (Special Hearing), and (3) conducting a post-hearing regular Art Commission meeting (Regular Meeting) at which it would hear additional public testimony and make an official recommendation to Mayor Peduto's office.  *Id.*

---

> authorities, the [Art] Commission shall, within forty-eight (48) hours after notice from them, approve or disapprove of the removal or relocation, and, in case of their failure to act within the period, they shall be deemed to have approved the action proposed.

(Code, *former* § 175.04.)  By Ordinance No. 36-2022, § 1, effective January 4, 2023, the City amended Chapter 175 of the Code in its entirety.  Section 175.04 was repealed and replaced with current Sections 175.01-03.  Therein, the Art Commission is re-titled the Public Art & Civic Design Commission.  (Code § 175.01(a).)  The Public Art & Civic Design Commission is composed of two committees: (1) the Public Art Review Committee, and (2) the Civic Design Review Committee.  (Code § 175.01(c)(1)(a)-(b).)  The Code authorizes the Public Art & Civic Design Commission to "adopt its own rules of procedure, consistent with relevant laws or ordinances."  (Code § 175.01(f).)  Most relevant to the issues in this case, Section 175.03 now provides, in part, as follows:

> (a) Decision making.  All action regarding Public Art and Civic Design shall require the Mayor's initiation. The Commission, including its Committees, cannot ratify a decision with regard to Public Art or Civic Design in the Public Realm without first receiving a written directive from the Mayor to consider the Public Art or Civic Design matter.

> (b) Public art. The Public Art [Review] Committee of the Commission shall review and approve the addition, modification, relocation, and removal from public view of items of Public Art as defined in Section 175.02(b). Approval shall be given in writing by a quorum as defined in Section 175.01(d).

(Code § 175.03(a), (b).)

4

The Art Commission conducted the Special Hearing on September 17, 2020, and the Regular Meeting on September 23, 2020. Thereafter, the Art Commission members voted to remove the Statue from Schenley Park. (First Amended Complaint, ¶¶ 21-22; R.R. at 00359a-60a.) Sometime prior to the Special Hearing and Regular Meeting, Mayor Peduto's office communicated with certain members of the Art Commission, which communications were interpreted by at least one Art Commission member as a threat "implying that we would be fired if we do [not] adhere to the wishes of [Mayor Peduto]." (R.R. at 00380a.)

On October 9, 2020, ISDA filed a complaint against the City and Mayor Peduto, followed on October 13, 2020, by an Emergency Motion for Special and Preliminary Injunction. (R.R. at 00001a, 00032a.) In its complaint, ISDA brought a single count for injunctive relief against Appellees, alleging that they violated the City's Home Rule Charter (Charter),[4] the right to due process guaranteed by the Pennsylvania Constitution, and the "Public Trust Doctrine" by unilaterally deciding to remove the Statue from Schenley Park. ISDA sought an injunction against Appellees precluding them from removing the Statue without first complying with all applicable "laws, regulations, and ordinances." (R.R. at 00012a.)

On October 14, 2020, after a status conference, the trial court ordered, with the City's agreement, that the Statue not be removed prior to the next regular Art Commission meeting and, in any event, not without first notifying the trial court. (R.R. at 00079a.) The trial court scheduled another status conference for October 29, 2020, after which it issued a memorandum and order on October 30, 2020 (October 30, 2020

---

[4] City of Pittsburgh, Pa., Home Rule Charter (2024), *available at* https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=HORUCHPIPE (last visited April 18, 2024).

5

Order).  Therein, and in partial reliance on James W. Loewen's book *Lies My Teacher Told Me*,[5] the trial court judge discussed at length his views on, *inter alia*, historiography, freedom of expression, Christopher Columbus, the post-Civil-War South, and the City's role in leading the nation on the issue of statue removal.[6]  The

---

[5] James W. Loewen, *Lies My Teacher Told Me: Everything Your American History Textbook Got Wrong* (Reprint ed., The New Press 2018) (1995).

[6] Specifically, the trial court explained:

> History is often said to be written by the "winners[,"] and our understanding of it as a nation tends to evolve over time as research reveals new understandings and our cultural norms change. Undoubtedly, history as taught to most in the United States has been from a nationalistic and [E]urocentric perspective.  Certainly, our national understanding of history is evolving today as evidenced by the statue removal movement occurring all over the United States with respect to Confederate and Union generals, [p]residents, explorers like Christopher Columbus, civil leaders, and here in Pittsburgh, past cultural icons like composer Stephen Foster.  My father, a career high school history teacher and lifelong reader of history, taught me at an early age that the commissioning of Confederate general[] statues in the Jim Crow [S]outh was part of the "Lost Cause" response to Reconstruction efforts and often [was] intended as [a] symbol of white supremacy, while the federal government's commissioning of military bases [] and battleships commemorating the Confederacy and the placement of Confederate figures in the halls of Congress were at least by some[] motivated by an intent to heal the nation.  Recently, in July [] 2020, Congress voted to remove those same figures from the House of Representatives as our understanding of history has evolved and the statues are no longer deemed appropriate in our contemporary nation trying to heal the issue of racial divide, ultimately inflamed by the killing of George Floyd in Minneapolis.
>
> Open[-]mindedness as a community requires that we listen to each other and weigh the concerns expressed collectively with the sincere intent of trying to understand all sides of an issue.  We must also be mindful that freedom of expression can be a double-edged sword.  The fate of the Christopher Columbus statue should be determined after all concerns are fully expressed and heard with an intent to reach a common ground that reflects Pittsburgh and its pride in being a diverse and welcoming community.  However, this must be done while recognizing the good and bad that comes with statues depicting

**(Footnote continued on next page…)**

trial court ordered the parties to conciliate the case and scheduled another status conference for November 20, 2020. (R.R. at 00219a.)

On November 13, 2020, ISDA filed a motion to recuse the trial court judge based on his commentary in the October 30, 2020 Order (Recusal Motion). (R.R. at 00220a.) ISDA alleged that the trial court judge's comments impermissibly interjected his personal views into the litigation, which created an "appearance of bias" that called into question his impartiality. (Recusal Motion, ¶¶ 2-3; R.R. at 00222a-23a.) The trial court denied the Recusal Motion by order filed November 17, 2021. (R.R. at 00891.) The trial court concluded that the historical references in the October 30, 2020 Order "had nothing to do with the legal issues for [the trial court] to decide," and, therefore, the trial court could continue to preside over the case without creating an appearance of impropriety. (R.R. at 00891a.)

ISDA filed its First Amended Complaint on November 11, 2021, in which it asserts five counts against Appellees. In Count I, ISDA alleges that Appellees violated its substantive and procedural due process rights under the Pennsylvania Constitution by (1) not affording ISDA adequate time and opportunity during the Art Commission's public proceedings to state its position regarding the Statue's removal, and (2) rendering a decision regarding the Statue's fate without a fair and impartial

---

historical figures. While acknowledging that historical figures are people and necessarily come with heroic qualities along with character flaws, nonetheless, racism, slavery and prejudice must always be condemned and rejected by our city. Discrimination has and continues to exist. Indigenous people and the immigrants who followed have all unfortunately shared that experience, [ ] which should [not] be acceptable to a community striving for better. With this common understanding, I am asking that we strive to reach a consensus in good faith. It is my belief that through conciliation, Pittsburgh will lead the nation on this issue of statue removal vis a vis history and evolving community historical understanding.

(R.R. at 00218a-19a) (footnote omitted).

7

tribunal. (First Amended Complaint, ¶¶ 77-96; R.R. at 00368a-70a.) In Count II, ISDA alleges that, as the successor-in-interest to the Sons of Columbus, it entered into a contractual relationship with the City "to maintain [the] Statue at Schenley Park in perpetuity." *Id.* ¶ 98; R.R. at 00371a. By "supporting and/or offering for a vote before the Art Commission" the Statue's removal from Schenley Park and covering the Statue and preparing it for removal, ISDA alleges that the City materially or anticipatorily breached the contract. *Id.* ¶¶ 97-102; R.R. at 00371a. In Count III, ISDA alleges that Appellees violated the Charter,[7] the Code, and the Ordinance by taking unilateral action to remove the Statue without first proposing legislation to City Council to repeal the Ordinance. *Id.* ¶¶ 106-117; R.R. at 00372a-73a. In Count IV, ISDA alleges that Appellees violated the "Public Trust Doctrine incorporated into the Pennsylvania Constitution through [a]rticle I, [section] 27[.]"[8] *Id.* ¶ 120; R.R. at 00374a. Finally, in Count V, ISDA seeks equitable relief in the form of an injunction enjoining Appellees from taking any further action to remove the Statue from Schenley Park. *Id.* ¶¶ 129-31; R.R. at 00375a-76a.

---

[7] Specifically, ISDA argues that Appellees violated Section 204 of the Charter, which governs the powers and duties of the mayor. Section 204(f) of the Charter provides that the mayor has the power and duty to "submit proposed legislation to any member of council for introduction," and Section 204(k) authorizes the mayor "to perform other duties and exercise other powers as stated in this charter or assigned by law, ordinance or resolution." (Charter, § 204(f), (k).)

[8] Article I, section 27 of the Pennsylvania Constitution, colloquially known as the Environmental Rights Amendment (ERA), provides that

> [t]he people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27.

Appellees filed preliminary objections to the First Amended Complaint, in which they challenged (1) ISDA's standing to bring this lawsuit,[9] (2) scandalous and impertinent matter in the First Amended Complaint, and (3) the legal sufficiency of ISDA's due process, contract, and public trust claims.[10]  (R.R. at 00412a-13a.)  On February 16, 2022, after briefing and argument on the preliminary objections, the trial court determined that Appellees' standing objection required discovery and fact-finding and ordered the parties to conduct limited discovery on the issue.  The trial court also directed additional briefing on two new issues apparently raised during oral argument, namely, (1) that ISDA owns the Statue, and (2) that the Virginia Supreme Court's reasoning regarding government speech in *Taylor v. Northham*, 862 S.E.2d 458 (Va. 2021), should govern the disposition of this case.  (R.R. at 00618a-19a.)  The trial court took all other preliminary objections under advisement "until the issue of standing is resolved."  (R.R. at 00564a.)

On March 1, 2022, ISDA filed a "Motion for Leave to File a Second Amended Complaint to Add [Sons of Columbus] as a Plaintiff" (Leave Motion), upon which the trial court did not immediately rule.  (R.R. at 00565a-620a.)  After taking discovery regarding ISDA's standing, which included written discovery requests and a deposition of a representative designated by ISDA, Appellees filed a supplemental

---

[9] Appellees argued, in part, that the trial court did not have subject matter jurisdiction due to ISDA's lack of standing.  However, questions of standing are not jurisdictional, may be waived, and will not be raised by a court *sua sponte. See Clark v. Cambria County Board of Assessment Appeals*, 747 A.2d 1242, 1244 n.1 (Pa. Cmwlth. 2000) (citation omitted); *County of Butler v. Local 585, Service Employees International Union*, *AFL-CIO*, 744 A.2d 338, 341 n.4 (Pa. Cmwlth. 1999) (citation omitted).

[10] Notably, other than a stray reference in paragraph 10, Appellees *did not* challenge the legal sufficiency of Count III of the First Amended Complaint in their preliminary objections.  Rather, Appellees first objected to Count III in their supporting brief.  *See* R.R. at 00411a, 00413a, 00435a-38a.

brief on June 17, 2022, in which they argued that, although ISDA does not have standing to bring this lawsuit, the question of standing ultimately is immaterial because the United States (U.S.) Supreme Court held in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2008), that monuments in public parks constitute government speech and that government entities have the right to speak for themselves in selecting the monuments erected in public places. (R.R. at 00642a.) Appellees relied extensively on *Taylor* and argued that it provided a "handy roadmap" for the trial court to conclude that "ISDA cannot be permitted to continue with this lawsuit as its position is not supported by either fact or law and this litigation is an improper interference with the democratic function of [the] City's government." (R.R. at 00669a, 00671a.)

On September 30, 2022, the trial court entered two orders. The first order sustained Appellees' preliminary objections under Pa.R.Civ.P. 1028(a)(4). The trial court found *Summum* to be controlling and that "its applicability compels dismissal of the ISDA['s] lawsuit." (R.R. at 00861a.) In its second order, the trial court dismissed as moot ISDA's Leave Motion. (R.R. at 00860a.) In the memorandum accompanying its order sustaining Appellees' preliminary objections, the trial court acknowledged that Appellees did not raise the issue of government speech in their original preliminary objections, but nevertheless concluded that the ownership of the Statue, the legal relationship between the City and the Sons of Columbus, and the City's ordinance enactment process were "simply immaterial" given that *Summum* gives the City "free reign to remove the [ ] Statue." (Trial Ct. Op., 9/30/22, at 7; R.R. at 00868a.)[11]

---

[11] Although the trial court indicated that it "substantially adopt[ed] many" of Appellees' arguments in their supplemental brief, the trial court did not make any findings of fact and did not rule on any of the specific preliminary objections originally lodged by Appellees. Instead, the trial court concluded that the original preliminary objections were mooted by the City's new argument that its attempt to remove the Statue was *carte blanche* protected as government speech. *See* Trial Ct. Op., 9/30/22, at 7 & n.3; R.R. at 00868a.

10

The trial court discussed at length the decisions in *Summum* and *Taylor* and concluded that they mandated dismissal:

> [ ] ISDA cannot point to law that supports its position that it has the authority to limit what the [m]ayor . . . and the [m]ayor's advisory committees do with respect to City-owned monuments on City-owned land. The [m]ayor is elected by the residents of [the City] and entrusted with the duty of effectuating speech that reflects the will and ideals of the voters. It is contrary to law and public policy to decide otherwise.
>
> Thus, given the framework built by the United States Supreme Court in [*Summum*] and the example set by the Virgina Supreme court in [*Taylor*], the City [ ] submits, and I agree, that [ ] ISDA cannot be permitted to continue with this lawsuit as its position is not supported by either fact or law and this litigation is an improper interference with the [City's] right to speech.

*Id.* at 19-20; R.R. at 00880a-81a.

ISDA timely appealed to this Court on October 4, 2022. The trial court ordered the filing of a Concise Statement of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Pa.R.A.P.) 1925(b), and ISDA timely complied on October 25, 2022. In response, the trial court filed three Pa.R.A.P. 1925(a) opinions. Regarding Appellees' preliminary objections, the trial court opined that ISDA's arguments regarding the binding nature of the Ordinance and the legal requirements of the Charter and Code were "procedural arguments at best," and, in any event, the entire case was moot given that the election of a new mayor in the interim gives Appellees a "do over." (Supplemental Rule 1925(a) Op., 1/6/23, at 2; R.R. at 00936a-37a.) The trial court further noted:

> In the end, the City [ ] is within [its] First Amendment[, U.S. Const. amend. I,] rights to decide whether to display the [ ] Statue or not, and as [the *Summum* decision concludes], those government speech rights are limited by and subject to the

11

> voters and[,] perhaps, further limited by requiring removal
> pursuant to proper procedure. While it is easy to read
> [*Summum*] as saying that even the procedure really does[
> not] matter much and it is really the ballot box that limits
> government speech, [ ] ISDA's suggested procedure could
> still be followed by the new [m]ayor, City Council, and [the]
> new Art[ ] Commission.

*Id.* at 3; R.R. at 00937a. In its second and third Rule 1925(a) opinions, the trial court incorporated its prior reasoning for denying the Recusal Motion and dismissing the Leave Motion as moot. R.R. at 00963a-64a, 00989a-90a.

## II. ISSUES

ISDA presents eight questions for review, which we fairly can combine and summarize as follows: (1) whether the trial court erred in dismissing ISDA's First Amended Complaint on the ground that Appellees' actions are protected government speech; (2) whether the trial court erred in implicitly concluding that ISDA does not have standing to assert the claims in its First Amended Complaint; (3) whether the trial court erred in concluding ISDA did not state a viable claim for breach of contract; (4) whether the trial court erred in concluding that ISDA did not state a viable claim pursuant to the Public Trust Doctrine; (5) whether the trial court erred in dismissing as moot ISDA's Leave Motion; and (6) whether the trial court erred in denying ISDA's Recusal Motion. Because they are dispositive of this appeal, we address only the first, fifth, and sixth issues.

## III. DISCUSSION

### A. Preliminary Objections[12]

---

[12] Our review of a trial court's order sustaining a preliminary objection in the nature of a demurrer is governed by the following principles:

> The question presented in a demurrer is whether, on the facts averred, the law indicates with certainty that no recovery is possible. In

**(Footnote continued on next page…)**

12

We begin with *Summum*,[13] which presented the question of "whether the Free Speech Clause of the First Amendment entitles a private group to insist that a municipality permit it to place a permanent monument in a city park in which other donated monuments were previously erected." 555 U.S. at 464. In *Summum*, a public park in the historic district of Pleasant Grove City, Utah contained 15 permanent displays, the majority of which were donated by private groups. *Id.* at 465. Summum, a religious organization, requested to place in the park a stone monument containing the "Seven Aphorisms" of its practice and belief. *Id.* The city denied the request, indicating that its practice was to limit monuments in the park to those either related to

reviewing a trial court's decision to grant a demurrer, our Court's standard of review is de novo. Thus, we will affirm a trial court's order sustaining preliminary objections and dismissal of a complaint only in cases that are clear and free from doubt that the law will not permit recovery by the appellant. In ruling on preliminary objections in the nature of a demurrer, this Court accepts as true all well-pleaded facts in the complaint and draws all inferences reasonably deducible therefrom in favor of the nonmoving party. However, we need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. And, in the face of doubt, our resolution should be in favor of reversing the grant of the demurrer.

*Vasquez v. Berks County*, 279 A.3d 59, 75-76 (Pa. Cmwlth. 2022) (internal citations, quotations, and bracketing omitted).

[13] We note, as did the trial court, that Appellees did not initially raise government speech as a legal ground for any of their preliminary objections. Rather, it appears they raised it for the first time during oral argument, which prompted the trial court to direct additional briefing. Ordinarily, arguments raised for the first time in a brief in support of preliminary objections will not be considered. *See Commonwealth ex rel. Corbett v. Peoples Benefit Services, Inc.*, 895 A.2d 683, 690 n.13 (Pa. Cmwlth. 2006) (citing Pa.R.Civ.P. 1028(b) ("All preliminary objections shall be raised at one time. They shall state specifically the grounds relied upon . . . .")). Nevertheless, both Appellees and ISDA raised new legal theories at oral argument, and both were permitted to conduct discovery and submit additional briefing. Moreover, ISDA did not object to the trial court's consideration of Appellees' government speech argument. We therefore conclude that the trial court properly considered it, and we will do likewise.

13

the history of the city or that were donated by groups with longstanding ties to the community. *Id.* Summum sued the city in federal court, alleging that the city had violated the Free Speech Clause of the First Amendment by permitting a Ten Commandments monument to be placed in the park but rejecting Summum's proposed monument. *Id.* at 466. Summum sought a preliminary injunction directing the city to accept Summum's proposed monument, which the federal district court denied. *Id.* The Tenth Circuit reversed.

On further appeal, the U.S. Supreme Court reversed the Tenth Circuit and concluded that the placement of privately donated monuments in a public park typically constitutes government speech not subject to the Free Speech Clause. The Supreme Court noted as follows:

> A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message.
>
> This does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause. The involvement of public officials in advocacy may be limited by law, regulation, or practice. And of course, a government entity is ultimately accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position.

*Id.* at 468-69 (internal citations and quotations omitted). Because the typical "forum analysis" conducted in cases challenging the government's restriction of private speech in public places generally does not apply to the installation of permanent monuments on public property, the Court concluded that Summum was not entitled to any relief under the Free Speech Clause. *Id.* at 480-81. *See also id.* at 464 ("[T]he display of a permanent monument in a public park is not a form of expression to which forum

analysis applies. Instead, [it] is best viewed as a form of government speech . . . not subject to scrutiny under the Free Speech Clause.").

Subsequently, in *Taylor*, the Supreme Court of Virginia applied *Summum* and its progeny to the following question:

> [W]hether language in an 1890 deed, signed by the then Governor of Virginia, and an 1889 joint resolution of the General Assembly, which requested and authorized the Governor to sign such deed, prohibit the Governor of Virginia from ordering the removal of a state-owned monument from state-owned property.

862 S.E.2d at 460. In *Taylor*, the deed at issue conveyed to the Lee Monument Association a parcel of property now located within the City of Richmond. The Lee Monument Association subsequently commissioned the construction of the monument and proposed to donate the property and Lee monument to the Commonwealth of Virginia. *Id.* Thereafter, in 1889, the Virginia General Assembly passed a joint resolution in which it requested that then-Governor P.W. McKinney accept the donation. *Id.* at 460-61. After the monument was completed, the Lee Monument Association executed a deed to the Commonwealth of Virginia conveying the property and the Lee monument. The deed contained a restrictive covenant in which the Commonwealth of Virginia agreed that it would hold the monument and property "perpetually sacred to the [m]onumental purpose to which they have been devoted" and would "faithfully guard it and affectionately protect it." *Id.* at 461.

In 2020, Virginia's governor, at public prompting, announced his intention to have the Lee monument removed. He thereafter directed and approved the plan of the Virginia Department of General Services to remove it. *Id.* In response, several individuals filed a lawsuit against the governor and other state officials alleging that the governor had no authority to remove the monument because the 1889 joint

15

resolution mandated that the Lee monument be kept and maintained perpetually. The plaintiffs also argued that removal of the monument would violate separation of powers principles, the Virginia Code, and the restrictive language of the deeds conveying the monument to the Lee Monument Association and the Commonwealth of Virginia. *Id.* During the pendency of the litigation, the Virginia General Assembly passed a bill repealing the 1889 joint resolution and directing that the Virginia Department of General Services, at the Governor's directive, remove and store the Lee monument. *Id.* at 462. After trial, the trial court entered judgment in the defendants' favor, concluding primarily that the current public policy of Virginia precluded enforcement of any restrictive language in the deeds conveying the Lee monument.

Relying in part on *Summum*, the Virginia Supreme Court affirmed, concluding that the 1889 joint resolution was not a binding statute and only served to express the policy views of the General Assembly in 1889. *Id.* at 469. That court further concluded that the public policy of Virginia regarding the Lee monument had changed and that erecting or removing public monuments on or from public property is a form of government speech that cannot be bartered away in restrictive covenants. The court therefore found that any restrictive language in the deeds conveying the monument was unenforceable as against public policy. *Id.* at 471.

Here, in its First Amended Complaint, ISDA does not challenge Mayor Peduto's or the Art Commission's actions on First Amendment grounds; nor does ISDA contest that the placement of the Statue in Schenley Park constitutes government speech that the City otherwise may regulate, change, or remove as it sees fit. Thus, ISDA does not argue that the government speech principles set forth in *Summum* and *Taylor* are inapplicable. Rather, ISDA argues that Mayor Peduto and the Art Commission, in taking action to remove the Statue, did not comply with applicable

16

provisions of the Charter and Code, violated ISDA's rights to due process, violated public trust principles, and breached a contract entered into between the City and ISDA's putative predecessor, the Sons of Columbus.

In issuing its decision, the trial court did not make any findings of fact and did not rule on any of Appellees' expressly pleaded preliminary objections, including the objection to ISDA's standing. Instead, the trial court broadly concluded that, because the Statue constitutes government speech, ISDA cannot, as a matter of law, plead a viable claim because the City is free to do with the Statue as it pleases, notwithstanding any local or state-wide legislation or other restrictions to the contrary. *See* Trial Ct. Op., 9/30/22, at 7; R.R. at 00868; Supplemental Rule 1925(a) Op., 1/6/23, at 5; R.R. at 00939a ("Local ordinances and state laws cannot be used to restrict future government's speech rights."). As is clear from *Summum*, however, the trial court plainly erred on this point.

Although a government generally may determine those views that it will espouse by way of its own speech, it nevertheless may not do so in violation of applicable "law, regulation, or practice." *Summum*, 555 U.S. at 468-69. For example, in *In re Friends of Marconi Plaza*, 287 A.3d 965 (Pa. Cmwlth. 2022), this Court considered whether a trial court erred in reversing the City of Philadelphia's Board of License and Inspection Review's (L&I Board) authorization of the removal of a Christopher Columbus statue from Marconi Plaza. The trial court reversed the L&I Board on the grounds that the City (1) failed to establish that removal of the statue was in the public interest, and (2) failed to comply with the City's own procedural requirements governing the preservation of public art and historic objects. *Id.* at 968. The trial court also concluded that certain objectors to the statue's removal, including

Friends of Marconi Plaza, had standing to challenge the legality of the statue's removal. *Id.* at 972.

We affirmed the trial court, concluding that the objectors had both individual and associational standing to challenge the removal. *Id.* at 978. We further concluded that the administrative process invoked to remove the statue violated an internally promulgated directive (Directive 67). We interpreted Directive 67 to be a binding "rule or regulation that supplements and implements" the City of Philadelphia's Home Rule Charter[14] and that had the "force and effect of law." *Id.* at 980. Although the status of the Christopher Columbus statue as government speech was not expressly at issue, the *Friends of Marconi Plaza* decision nevertheless instructs that municipal governments must abide by all rules and regulations, even those promulgated internally, that have the force of law before they may remove public monuments or artwork from public spaces. The fact that such monuments or pieces of art constitute "government speech" only protects the government from certain First Amendment challenges. *Summum.* It does not, as the trial court here concluded, give government "free reign" to act as it pleases in defiance of the law.

Moreover, the Virginia Supreme Court's decision in *Taylor*, although not binding on this or any other Pennsylvania court, also supports this conclusion. A close reading of *Taylor* reveals that the Virginia Supreme Court went to significant lengths to analyze whether the 1889 joint resolution and restrictive covenants at issue were binding on the governor because that court implicitly recognized what the U.S. Supreme Court had explicitly ruled in *Summum*: a government's right to regulate and express its own speech is limited by applicable "law, regulation, or practice." *See*

---

[14] City of Philadelphia, Pa., Home Rule Charter (2024), *available at* https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-262986 (last visited April 18, 2024).

18

*Taylor*, 862 S.E.2d at 466-71. Although the court in *Taylor* concluded that the joint resolution was not a legislative enactment with the binding legal force of a statute, *id.* at 469, the decision in *Taylor* nevertheless does not interpret *Summum* to hold that classification as "government speech" categorically exempts government expression from legal scrutiny.

The trial court below did not make any findings or rulings regarding whether Appellees' actions in seeking to remove the Statue from Schenley Park violated the Charter, the Code, or the Ordinance. It instead dismissed ISDA's claims on the ground that such procedural irregularities did not matter in light of *Summum*. The trial court further declined to make any findings or rulings regarding whether the Art Commission's administrative proceedings were constitutionally adequate or whether ISDA had standing to bring this lawsuit in the first place. The trial court instead cast ISDA's claims as "procedural arguments at best" and did not analyze them. (Supplemental Rule 1925(a) Op., 1/6/23, at 2; R.R. at 00936a.) The trial court further explained that, even if ISDA is correct and Appellees violated the Charter, Code, and/or Ordinance in pursuing the Statue's removal, the new mayor's administration is still free to comply, if it wishes to do so. *Id.* In any event, according to the trial court, ISDA's claims against Appellees are now moot, and the new mayor's administration has effectively been granted a "do over." *Id; see also id.* at 3; R.R. at 00937a) ("While it is easy to read Justice Alito's opinion [in *Summum*] as saying that even the procedure really does[ not] matter and it is really the ballot box that limits government speech, [] ISDA's suggested procedure could still be followed by the new [m]ayor, City [c]ouncil, and Art[ ] Commission.").

Under *Summum* and *Friends of Marconi Plaza*, we simply cannot agree with the trial court's conclusions that (1) the Statue's status as government speech

19

renders Appellees' actions *per se* valid, and (2) ISDA's claims are irrelevant procedural quibbles now mooted by the new mayor's ability to comply with the law if he so chooses. Further, although the parties have briefed the issues of ISDA's standing and the legal viability of its claims, we will not rule on those issues in the first instance, particularly where, as here, the case was disposed of at the preliminary objection stage without any findings of fact. We accordingly reverse the trial court's order dismissing the First Amended Complaint based on the government speech doctrine and remand for further factfinding and decision, as appropriate, on Appellees' remaining preliminary objections.

## B.    Recusal Motion

Rule 1.2 of the Pennsylvania Code of Judicial Conduct provides that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Pa. Code of Judicial Conduct Rule 1.2. "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge . . . engaged in . . . conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." *Id.* Rule 1.2, Comment 5. Rule 2.11(A) further provides that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ." *Id.* Rule 2.11(A). Thus, a party requesting recusal must introduce evidence establishing bias, prejudice, or unfairness that "raises a substantial doubt as to the jurist's ability to preside impartially." *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 89 (Pa. 1998). A recusal motion initially is "directed to and decided by the jurist whose impartiality is being challenged." *Id.* The Pennsylvania Supreme Court has further explained:

20

In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make . . . . Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion.

*Id.* (citations omitted). There is a presumption that Commonwealth judges are "honorable, fair and competent," *id.* at 89 (citation omitted), and, when confronted with a recusal request, are competent to determine whether they can rule "in an impartial manner, free of personal bias or interest in the outcome." *DeLuca v. Mountaintop Area Joint Sanitary Authority*, 234 A.3d 886, 897 (Pa. Cmwlth. 2020) (citation omitted). Our Supreme Court also has recognized that,

[w]hile the mediation of courts is based upon the principle of judicial impartiality, disinterestedness, and fairness pervading the whole system of judicature, so that courts may as near as possible be above suspicion, there is, on the other side, an important issue at stake: that is, that causes may not be unfairly prejudiced, unduly delayed, or discontent created through unfounded charges of prejudice or unfairness made against the judge in the trial of a cause. . . . If the judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final unless there is an abuse of discretion. This must be so for the security of the bench and the successful administration of justice. Otherwise, unfounded and ofttimes malicious charges made during the trial by bold and unscrupulous advocates might be fatal to a cause, or litigation might be unfairly and improperly held up awaiting the decision of such a question or the assignment of another judge to try the case. If lightly countenanced, such practice might be resorted to, thereby tending to discredit the judicial system. The conscience of the judge alone is brought

21

in question; he should, as far as possible, avoid any feelings of unfairness or hostility to the litigants in a case.

*Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority*, 489 A.2d 1291, 1299 (Pa. 1985).

Here, ISDA argues that the trial court judge should have recused himself from presiding over this case because the extensive commentary in the October 30, 2020 Order created an appearance of impartiality, bias, and impropriety. More specifically, ISDA argues that the trial court judge's interpretations of his father's teaching career, the Lost Cause of the Confederacy, the Jim Crow South, ethnic discrimination, and the City's exemplary future in leading the nation in statue removal injected extraneous and irrelevant issues into a lawsuit involving straightforward claims asserting that Appellees did not comply with the Charter, Code, and Ordinance. (ISDA Br. at 55-58.) ISDA therefore argues that the trial court abused its discretion in denying the Recusal Motion.

We generally agree with ISDA that the personal commentary in the trial court's October 30, 2020 Order is irrelevant and extraneous and does not inform the legal analysis of the claims asserted in the First Amended Complaint. We nevertheless cannot conclude that the trial court's denial of the Recusal Motion constituted a clear abuse of discretion. To the extent that ISDA claims that the personal nature and irrelevance of the commentary indicates bias, it is the very irrelevance of the bulk of the trial court's order that requires affirmance on this issue. The issues in this case center on the legislative status of the Ordinance, the procedures in the Charter and Code, if any, that are applicable to public monument removal, and ISDA's standing to bring this lawsuit. The trial court has yet to rule on any of those issues. The personal opinions the trial court judge has expressed on subjects immaterial to their resolution do not themselves constitute evidence that, as to the disposition of the actual issues at

22

hand, he will be biased, prejudiced, or unfair to a degree that raises substantial doubt as to his ability to preside impartially. Without such evidence, we must defer to the trial court judge's own self-assessment that he can, and we trust will, preside over the resolution of this matter in an impartial and judicious manner. Accordingly, we affirm the denial of the Recusal Motion.

## C.     Leave Motion

Lastly, because the trial court dismissed as moot ISDA's Leave Motion based on its dismissal of the First Amended Complaint, we vacate the trial court's order dismissing the Leave Motion and remand for the trial court to consider, if necessary, whether leave to file a second amended complaint should be granted.

## IV.     CONCLUSION

The trial court erred in concluding that ISDA's claims are barred in their entirety based exclusively on the U.S. Supreme Court's decision in *Summum* and the Virginia Supreme Court's decision in *Taylor*.  We accordingly reverse the trial court's September 30, 2022 order dismissing ISDA's First Amended Complaint on that ground.  We relatedly vacate the trial court's September 30, 2022 order dismissing as moot ISDA's Leave Motion and remand to the trial court to consider it on the merits, as necessary.  Because we conclude that the trial court did not commit a clear abuse of discretion in denying the Recusal Motion, as the issues on which the trial court judge opined are immaterial to the disposition of this matter, we affirm the trial court's November 17, 2021 order.  Finally, because the trial court did not expressly rule on any of Appellees' other preliminary objections, we remand the matter to the trial court to consider, as appropriate, the merits of the outstanding  preliminary objections.

_____
PATRICIA A. McCULLOUGH, Judge

Judge Wojcik concurs in the result only.

23

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Italian Sons and Daughters of America, :
                       Appellant :
                              :
           v. :   No. 1124 C.D. 2022
                              :
City of Pittsburgh and Mayor :
William Peduto :

## **ORDER**

AND NOW, this 19th day of April, 2024, it is hereby ORDERED as follows:

(1)    The November 17, 2021 order of the Court of Common Pleas of Allegheny County (trial court) denying Appellant's Motion for Recusal is AFFIRMED;

(2)    The trial court's September 30, 2022 order sustaining the preliminary objections of the City of Pittsburgh and Mayor William Peduto is REVERSED;

(3)    The trial court's September 30, 2022 order dismissing the Italian Sons and Daughters of America's (Appellant) Motion for Leave to File a Second Amended Complaint is VACATED; and

This matter is remanded to the trial court for further proceedings consistent with the directives set forth in the foregoing Opinion.

Jurisdiction relinquished.

 

                               _____
                               PATRICIA A. McCULLOUGH, Judge